IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PELOTON INTERACTIVE, INC.,     )
     )
     Plaintiff,     )
     )
     )     C.A. No. _____
     v.     )
     )     **DEMAND FOR JURY TRIAL**
iFIT, INC.,     )
     )
     Defendant.     )
     )

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Peloton Interactive, Inc. ("Peloton") brings this action against iFIT, Inc. ("iFIT"), and alleges as follows:

## SUMMARY OF THE ACTION

1.     Since its inception in 2012, Peloton has revolutionized the fitness industry, becoming the largest interactive fitness platform in the world with a loyal community of over 5.9 million members. In fiscal year 2021 alone, its members completed over 459 million Peloton workouts. Peloton makes fitness entertaining, approachable, effective and convenient while fostering socialconnections that encourage its members to be the best versions of themselves. Peloton delivered its first bikes (the "Peloton Bike") in 2014 and received near-universal adulation, with *Men's Health* naming the Bike "the best cardio machine on the planet," and fitness experts hailing it as "revolutionary," and "category creating." Peloton currently employs more than 8,000 people and earned more than $4.0 billion in revenue in fiscal year 2021.

2.     The Peloton Bike is the first ever at-home exercise bike that incorporates a sophisticated graphical user interface—presented on a 22-inch HD, multitouch tablet—that displays live and on-demand cycling classes led by some of the world's best instructors. The Peloton Bike uses sensors to measure a rider's performance and can display a dynamically-updating leaderboard comparing the rider's performance at each point in the class with the performance of every other rider that is currently taking—or has ever taken—the same class,anywhere in the world. This "leaderboard" utilizes Peloton's patented technology to show Peloton riders how their performance stacks up against all other riders that have taken that same class, past and present, at every point during a class.

3.     Before Peloton invented and released the Peloton Bike, the fitness industry had struggled with an intractable divide: consumers could either (1) go to in-studio fitness classes to obtain the competitive thrill and engagement of working out with others, or (2) choose to use at-home exercise equipment—which had seen virtually zero innovation in over a decade—to gain flexibility and time. They could never do both. Peloton solved that problem, and others, with its revolutionary new product and patented technology.

4.     *First*, Peloton solved the biggest problem associated with in-studio and in-person exercise classes—that they are offered only at fixed locations and times—by allowing users to bring that experience into their own home and on their own schedule. *Second*, Peloton solved the biggest problem associated with previous at-home fitness products—user boredom due to lack of engagement, community, and class variety—by providing live and on-demand classes with a leaderboard on an improved and more efficient graphical user interface that not only recreates but *significantly enhances* the real-time competition and community engagement that made in-person and in-studio classes so popular.

5.     To protect these and other innovations incorporated into the Peloton Bike and the Peloton Tread (Peloton's acclaimed treadmill, released in 2018), Peloton CEO John Foley and Peloton applied for, and received, multiple patents, including U.S. Patent No. 11,170,886 ("the '886 Patent"), Peloton's most recently issued patent, and  U.S. Patent No. 10,864,406 ("the '406 Patent").

6.     In particular, the '886 Patent emphasizes Peloton's proprietary systems, which interconnect Peloton's bikes and treads, enabling users to participate with other Peloton users in live and on-demand exercise classes. The '886 Patent's claims focus on, among other things, the control station and its role in collecting and synchronizing live performance parameters during live sessions of on-demand exercise classes.

7.     The claims of the '886 Patent further recite maintaining the synchronized live performance parameters collected during the live session of the on-demand exercise class. Those collected live performance parameters are used in subsequent sessions of the exercise class to enable ghost participants. That innovative technology provides classes that include an ever-growing list of participants. Each live session of an on-demand class changes the competitive make-up of the class and presents users with a different set of competitors to challenge on Peloton's leaderboard.

8.     In December 2020, expanding upon its success as a pioneer at the nexus of fitness, technology, and new media, Peloton acquired prominent fitness manufacturer Precor Inc. ("Precor") and its intellectual property, including U.S. Patent No. 8,827,870 ("the '870 Patent") and U.S. Patent No. 7,938,755 ("the '755 Patent").

9.     With Peloton's hard-fought success, competitors, including Defendant iFIT Inc., have attempted to free ride off Peloton's innovative technology. Historically, iFIT Inc. has sold

traditional fitness equipment, and it develops and manufactures exercise equipment (including stationary bikes and treadmills) under the brand names NordicTrack, ProForm, and FreeMotion (collectively, the "iFIT products").

10.     For years, iFIT Inc. sought to drum up interest in the iFIT products with its iFIT Functionality – functionality encompassing a simplistic suite of fitness offerings designed to operate on, or in tandem with, iFIT products. Prior to the actions giving rise to this suit, iFIT Functionality never delivered live classes—i.e., classes taught by instructors and streamed to users' devices in substantially real time—or offered its members the ability to participate in competitive classes via a leaderboard. Instead, iFIT Functionality only allowed subscribers to follow along with pre-recorded exercise classes on their machines, without any sort of community engagement. Although iFIT Inc. apparently intended for iFIT Functionality to boost consumer enthusiasm and sales of its products, its actions demonstrate it was not able to reach its goal. Indeed, in July of 2015, just one year after the launch of the successful Peloton Bike, iFIT Inc. announced that it was laying off 400 workers at the Utah plant where it manufactures much of its equipment.

11.     In 2019, Peloton became the unquestioned leader in at-home fitness and continued to achieve lightning-fast growth as it went public on the NASDAQ stock exchange in September 2019. By that point, it had become clear to the market that consumers were tired of the same boring, at-home fitness equipment that had languished in basements for decades—like the iFIT products—and instead wanted the revolutionary new "connected" community fitness experiencethat Peloton offered through its patented technology.

12.     Faced with this grim reality, the *very same month* as Peloton's IPO, iFIT Inc. announced that it would be releasing a so-called new feature: "the iFIT leaderboard," which was nothing more than the Peloton leaderboard grafted onto an iFIT interface. On September 27, 2019,

4

iFIT Inc. published a picture on The Official iFIT Member Facebook page making clear that rather than investing in its own technology and innovating from the ground up—as Peloton had done—iFIT Inc. would simply copy Peloton's patented leaderboard technology. Shortly thereafter, iFIT Inc. announced that it had raised $200 million in venture capital to help "accelerate" theintegration of its copycat technology into iFIT Inc.'s products. As media outlets like Axiom recognized at the time, iFIT Inc.'s actions were plainly intended to allow it to "compete with Peloton," and reflected "how home fitness companies and their investors keep moving towardthe Peloton model…."

13.     Then, in January of 2020, iFIT Inc. launched an expensive, glossy video ad campaign for a new Peloton Bike copycat product that iFIT Inc. calls the NordicTrack S22i Studio Cycle Bike. That ad, entitled "The Duel," shows two actors riding their NordicTrack bikes at the same time and competing against each other for a higher position on the iFIT leaderboard. The iFIT leaderboard iFIT Inc. advertised in "The Duel," shown on the NordicTrack S22i Studio Cycle Bike, is an almost exact copy of Peloton's leaderboard.

14.     Astoundingly, iFIT Inc. did not stop there: it introduced Peloton's patented technology across *all* iFIT products with iFIT functionality[1]—including not only stationary bikes and treadmills, but also rowers, ellipticals, and high-intensity interval training machines. Italso

---

[1] The list of infringing iFIT Inc. products include the following: ProForm Pro 9000 Treadmill, ProForm Pro 2000 Treadmill, ProForm Carbon T10 Treadmill, ProForm Carbon T7 Treadmill, ProForm City L6 Treadmill, ProForm Studio Bike Pro 22, ProForm Studio Bike Pro, ProForm Carbon CX Studio Bike, ProForm 440 ES Recumbent Bike, ProForm 8.0 EX Upright Bike, ProForm Studio Bike Limited, ProForm 750R Rower, ProForm Pro R10 Rower, ProForm 759R Rower, ProForm Carbon HIIT H14 Elliptical, ProForm Carbon HIIT H7 Elliptical, ProForm Carbon E7 Elliptical, ProForm Carbon EL Elliptical, ProForm Hybrid Trainer XT Elliptical, NordicTrack Commercial X321 Incline Trainer, NordicTrack Commercial X22i Incline Trainer, NordicTrack Commercial 1750 Treadmill, NordicTrack Commercial 2450 Treadmill, NordicTrack Commercial 2950 Treadmill, NordicTrack T 6.5 Si Treadmill, NordicTrack EXP 7i Treadmill, NordicTrack EXP 10i Treadmill, NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack Commercial VR25 Recumbent Bike, Nordictrack Commercial R35 Recumbent Bike, NordicTrack Commercial VU 19 Upright Bike, NordicTrack Commercial VU 29 Upright Bike, NordicTrack FS14i Elliptical, NordicTrack FS10i Elliptical, NordicTrack Commercial 9.9 Elliptical, NordicTrack Commercial 14.9 Elliptical, NordicTrack Commercial SpaceSaver SE9i Elliptical, NordicTrack Commercial SpaceSaver SE7i Elliptical, NordicTrack Fusion CST Pro, NordicTrack Fusion CST Pro with Rower, NordicTrack RW900 Rower, NordicTrack RW700 Rower, NordicTrack RW500 Rower, FreeMotion t22.9 Reflex Treadmill, FreeMotion i22.9 Incline Trainer, Freemotion T10.9b Reflex Treadmill, FreeMotion e22.9 Elliptical, Freemotion E10.9b Elliptical, FreeMotion CoachBike, FreeMotion r22.9 Recumbent Bike, FreeMotion u22.9 Upright Bike, and Freemotion R10.96b Recumbent Bike. Upon information and belief, each of these products became available for public purchase after May 22, 2017.

advertised for sale exercise systems that, among other things, detect, synchronize and compare the exercise metrics of remote users on a graphical user interface, just like Peloton.

15.     iFIT Inc., and iFIT products with iFIT functionality, infringes the '886 Patent by, among other things, operating servers that connect a plurality of exercise devices, allowing users to participate in on-demand exercise classes, the servers collecting a remote user's performance parameters, and synchronizing that remote user's performance against the performance of other remote users participating in a live session of an on-demand exercise class. Echelon also infringes the '886 Patent by imitating the Peloton Bike experience through the "Echelon Fit App" which, among other things, detects, synchronizes, and compares the ride metrics of remote users on a graphical user interface

16.     Additionally, iFIT Inc., and iFIT treadmill products with iFIT functionality infringe the '406 Patent by, among other things, displaying treadmill class content to remote users that includes a segmented timeline indicating different class portions, tracking remote users' performance throughout the different class segments, and displaying a comparison of the users' performance alongside the segmented class timeline via a time-synced leaderboard that is updated as the class progresses.

17.     Critically, iFIT Inc. is profiting immensely from this infringement; indeed, in March 2020, iFIT Inc.'s Chief Executive Officer told the Wall Street Journal that its recent sales were up over 200%. And in May 2020, iFIT Inc.'s President reported to the New York Times that it was experiencing sales that were "absolutely bigger than any other boom time we've had."

18.     Having discovered just how lucrative it was to mimic Peloton, iFIT Inc. doubled down on its unlawful scheme. In May 2020, iFIT Inc. set its sights on yet another Peloton innovation—live classes with a real-time leaderboard—and decided that it would copy this aspect

of the Peloton experience, as well. In all its years of existence, iFIT Inc. had never offered live classes on its iFIT Functionality. Yet in early May 2020, on the heels of its copycat leaderboard roll-out, iFIT Inc. enabled live classes on iFIT for users operating iFIT Inc. bikes and treadmills. iFIT Inc.'s introduction of live classes and the leaderboard is calculated to perfect its theft of market sharefrom Peloton, who has set the standard for both technologies in the at-home fitness space.

19.     As if its unlawful copying of Peloton's patented technology with iFIT's exercise classes and "iFIT leaderboard" were not enough, iFIT has additionally engaged in the unlawful use and appropriation of patented technology and intellectual property acquired by Peloton, including at least the '870 and '755 Patents.

20.     For example, in February 2021, just months after Peloton announced its agreement to acquire Precor and its intellectual property, iFIT Inc. announced its ActivePulse and SmartAdjust features for products with iFIT functionality.  iFIT Inc. and iFIT products with iFIT functionality infringe the '870 Patent by, among other things, receiving a user's selected workout program and goals, detecting workout metrics of the remote user, and adjusting subsequent workouts of the user based on the detected metrics, and the user's profile data and workout program.

21.     Further, iFIT Inc. and certain iFIT treadmill products infringe the '755 Patent by, among other things, including an air dam component that extends generally a majority length of the roller and substantially isolates the motor compartment from the endless belt, thereby substantially reducing airflow and cross-contamination of debris between the endless belt and the motor compartment.

22.     Peloton brings this suit to protect its rights and put an end to iFIT's infringement of the '886 Patent, '406 Patent, the '870 Patent, and the '755 Patent (collectively, the "Asserted Patents").

## THE PARTIES

23.     Peloton is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 125 West 25th Street, 11th Floor, New York, New York, 10001.

24.     iFIT Inc. is a corporation organized and existing under the laws of the State of Delaware. iFIT Inc.'s principal place of business is at 1500 South 1000 West, Logan, Utah, 84321. iFIT Inc. sells its products online and through third-party retailers all across the United States, and additionally operates an outlet store in California, located at 630 Nicholas Road, Beaumont, CA 92223.

## JURISDICTION AND VENUE

25.     The claim in this civil action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq. This Court has subject matter jurisdiction over the patent claim pursuant to 28 U.S.C. §§ 1331 and 1338.

26.     This Court has personal jurisdiction over iFIT Inc. pursuant to the laws of the State of Delaware and the United States Constitution because iFIT Inc. is a Delaware corporation. iFIT Inc. also regularly and continuously transacts business in the jurisdiction, including marketing and selling iFIT Inc. services and products throughout the State of Delaware. iFIT Inc. places infringing products within the stream of commerce, which stream is directed at this district, with knowledge and/or understanding that those products will be sold in the State of Delaware.

27.     iFIT Inc. has infringed or caused infringement in the State of Delaware by, among other things, promoting, offering for sale and selling infringing iFIT products with iFIT functionality in the District. iFIT Inc. also provides services and assembles products that are and have been used, offered for sale, sold, and purchased in the State of Delaware. Therefore, the exercise of jurisdiction over iFIT Inc. is appropriate under the applicable jurisdictional statutes and would not offend traditional notions of fair play and substantial justice.

28.     Venue is proper for claims of patent infringement in this district under 28 U.S.C. §§ 1391(b) & (c) and 1400(b) because iFIT Inc. is incorporated in the State of Delaware and has committed, and continues to commit, acts of patent infringement within the district.

29.     iFIT Inc. actively markets and sells iFIT products with iFIT functionality to customers across the United States, including in the District of Delaware.

30.     iFIT Inc. intends to and does advertise, demonstrate, offer for sale, and sell the infringing products and services to customers in the District of Delaware. iFIT Inc. intends for customers to use the infringing products with iFIT functionality within the District of Delaware.

31.     iFIT Inc. admits personal jurisdiction and venue is proper by failing to object to personal jurisdiction and affirmatively stating that venue is proper in *Peloton Interactive, Inc. v. iFIT Inc.*, No. 20-662 (RGA) (D. Del. May 15, 2020).[2]

**FACTUAL ALLEGATIONS**

## I.     Disrupting the Fitness Category with the Peloton Bike

32.     Since being founded in early 2012, Peloton has revolutionized the fitness industry with its category-creating at-home cycling bike, the Peloton Bike. Unlike the at-home bikes that

---

[2] In addition, the following actions between the parties are pending in this Court: *iFIT Inc. v. Peloton Interactive, Inc.*, No. 21-507 (RGA) (D. Del. April 7, 2021); *iFIT Inc. v. Peloton Interactive, Inc.*, No. 20-1386 (RGA) (D. Del. Oct. 15, 2020); *Peloton Interactive, Inc. v. iFIT Inc.*, No. 20-1535 (D. Del. Nov. 16, 2020);.

came before it, the Peloton Bike is a sleek, technologically advanced system that combines a first-in-class exercise bike with state-of-the-art technology that allows riders to experience live and on-demand cycling classes—led by some of the world's best instructors—from the comfort of their own homes.

33. Featuring a 22-inch, high-definition, sweat resistant, multitouch tablet, the Peloton Bike measures and displays a rider's performance metrics and presents those metrics for live and time-synced comparison with other Peloton riders. This new technology allows Peloton riders to see where their performance stands against all other riders on a leaderboard throughout the cycling class, re-creating the energetic and competitive in-studio cycling experience at home on their own schedule.

34. In fact, not only does Peloton recreate the in-studio experience in the user's own home, it significantly improves it. To illustrate the unprecedented user experience Peloton created, a rider taking a regular in-studio class may (at best) see his or her performance compared only against the other riders in the same class at the same time, whereas the same rider taking a class on a Peloton Bike can see his or her performance compared, at every point in the class, against tens of thousands (for a live class) or even hundreds of thousands (for an on-demand class) of other riders from around the world, regardless of when the rider takes the class.

35. Further, Peloton's leaderboard allows each user to filter and control who they see on the leaderboard by a variety of characteristics, including age and gender. Peloton's leaderboard also enables filtering by "All Time," which allows the user to participate against all users who have ever taken the same class, or by "Here Now," which displays only those users who are presently attending the same class at another remote location.

36.     In addition, Peloton allows its users to interact with other remote users during a class, for example, by giving a virtual "high five" to another user, encouraging a friend via live



video chat, or, with one touch, saving a song heard in class to their favorite streaming service. These features are not available (nor would they be useful) for in-studio-only cycling classes.

*Above: The Peloton Bike+*



*Above: The Peloton Bike Graphical User Interface, Leaderboard, and Live Video Chat*



*Above: Peloton Leaderboard Filters – "All Time," "Here Now" and #Tags*

37.     Peloton's success has been remarkable. *Men's Health* has called the Peloton Bike "the best cardio machine on the planet." *USA Today* has said it is "attractive, addictive, and seriously whips you into shape." And in a comparison of numerous at-home bikes, *The Wall Street Journal* concluded that "the best bike, by far, was [the] Peloton." The Peloton Bike also received the award for the Best Health and Fitness Device at the Consumer Electronics Show in 2018.

38.     The Peloton Bike retails for $1,495 and the Peloton Bike+ retails for $2,495. Owners pay $39 per month for Peloton's All-Access Membership, which includes exclusive live and on-demand cycling classes as well as other exercise content.

39.     As of fiscal 2021, Peloton has built its member base from zero to over 5.9 million in nine years. Its revenue has been growing rapidly as a result. For example, in fiscal year 2017, Peloton's revenue shot to over $200 million, and in fiscal year 2018, revenue doubled to over $400 `million. In fiscal year 2019, its revenue more than doubled again to approximately $900 million. In fiscal year 2020, its revenue doubled once more to over $1.8 billion. And in fiscal year 2021, Peloton more than doubled its revenue again to over $4.0 billion. Peloton has also won countless awards, including being named one of the World's Most Innovative Companies by Fast Company in 2016, 2017, 2018, 2019, and 2021.

## II.     The Journey to Inventing the Peloton Bike

40.     When Peloton was founded, fitness studios that provided studio cycling classes were becoming tremendously popular. SoulCycle and Flywheel had multiple studios and were growing quickly. While such in-studio classes provide a great consumer experience, they start at predetermined times, have limited space per class, and may meet at inconvenient locations for some customers. As a result, in-studio classes can be hard to attend for people with busy work schedules and families at home. Peloton CEO John Foley was one of those people.

41.     After realizing that countless others undoubtedly faced the same challenge, Foley began a journey that would see him and his co-founders invent a new category of fitness equipment that provides the immersive, fun and competitive in-studio cycling class experience, at home, at any time.

42.     Having majored in industrial engineering at Georgia Tech and studied business at Harvard Business School, Foley then worked in e-commerce and the tech industry for over a decade. This gave him a sophisticated understanding of the intersection of business and technology. Foley also realized that this project would require a team of smart, savvy leaders in different fields to bring it to consumers, and he therefore started recruiting other tech leaders who shared his vision.

43.     In September 2011, Foley shared his vision with Hans Woolley, co-inventor of the '886 Patent, at a conference for media executives in Sun Valley, Utah. The two bounced ideas back and forth during the weekend conference and began planning next steps shortly after arriving home from the conference.

44.     Foley also approached his friend and former colleague Tom Cortese. Over dinner one night in December 2011, Foley told Cortese that he believed there was a large, untapped market available if they could just figure out how to allow cycling fans to access the best instructors and have an in-studio cycling class experience at any time, no matter where they live and no matter how busy their schedules are. Cortese joined and has been with Peloton ever since, currently serving as Peloton's Chief Product Officer.

45.     Foley also recruited three others, whom he asked to join as co-founders of Peloton: technology guru Yony Feng, to help design and build a prototype Peloton Bike; accomplished lawyer Hisao Kushi, to guide Peloton through the legal and regulatory framework facing the new

start-up; and internet executive Graham Stanton, to help guide the company through its early years and to manage the company's finances and growth strategy. All accepted, and all three remain involved with the company to this day. Feng is Peloton's Chief Technology Officer; Kushi is Chief Legal and Culture Officer, and Corporate Secretary; and Stanton still advises Peloton in a consulting capacity.

46.     With a strong team in place, Foley was able to raise an initial seed investment of $350,000, along with $50,000 of Foley's own savings. This allowed the young start-up to rent a small office in New York City from which it could develop and create the first prototype of the Peloton Bike.

47.     To create the product that Foley and his co-founders envisioned, Peloton developed (1) a visually appealing, sturdy, and technologically advanced exercise bike; (2) a large, sweatproof, wi-fi enabled, high-definition touchscreen tablet computer; (3) an attractive graphical user interface and related software and backend systems to integrate the bike and tablet and track, synchronize, and dynamically display metrics to connect a community of riders; and (4) first-in-class cycling class content and the systems to deliver that content. All equipment needed to be durable, lasting for years of use with minimal maintenance.

48.     Start-ups often partner with existing companies and products to custom build as little as possible. Building one's own hardware and software from the ground up, by contrast, is expensive, time-consuming, and fraught with obstacles, known and unknown. However, Peloton quickly discovered that no existing exercise bike had all the required characteristics: sturdiness, durability, visual appeal, efficiency, and technological capability. Nor was there any touchscreen tablet available on the market at the time that would suit its needs. In addition, Peloton realized that no existing products could communicate with the bike hardware, or track and analyze rider

15

performance in the way they envisioned. In short, the Peloton team quickly realized that it would need to create virtually the entire Peloton Bike from scratch, including the bike, tablet, and software.

49.     What's more, to effectuate its vision of immersive studio cycling at home, Peloton also needed to figure out how to integrate the hardware (the bike and tablet) with its own software so that the software could communicate with the bike to track performance metrics, store those metrics, communicate those metrics back to the rider, and transfer those metrics to a server so that they could be synchronized and compared with other riders' metrics.

50.     The technological challenges and unknowns faced by the Peloton team also created a significant financial hurdle. Investors viewed Peloton's plan to build its own hardware and software as too costly and difficult, and were not convinced there was a viable market for the product or that the technology would work. Dozens of investors declined the opportunity to invest in Peloton because they were not willing to take the risk of investing up front in such a new and challenging endeavor.

51.     Yet, through research, ingenuity, and persistence, Peloton pushed on, working with two core manufacturing partners to design and produce the necessary high-tech, sleek bikes and tablets. To build the first prototype, Feng, the Chief Technology Officer then and now, created a proof-of-concept apparatus using a standard off-the-shelf stationary bike, then attaching sensors with a stripped-down electronics board running the Android-based app that he developed and a computer monitor rigged to the bike's front. As reflected in the images below, Feng went through a long, iterative process to develop a successful hardware-software integration.




*Above: Testing the software with an early version of Peloton Bike*

*The early version of the Peloton Bike, left, compared with the version at launch, right:*






*The progression of hardware-software integration development for the Peloton Bike:*

52.     This unique hardware-software integration would be the basis for Peloton's prototype. By the end of 2012, after a year of hard work, investment, and development, Peloton finally had a prototype in hand to show investors.

53.     But even after the Peloton Bike prototype was created, Peloton struggled to raise money. Foley was rejected by countless investment firms and was repeatedly told that the Peloton Bike simply was not viable.

54.     Yet, despite these repeated rejections, Foley persisted—continuing to take risks, making significant personal investments, and dedicating more time to developing the best possible product. He did so because of his belief that at-home fitness equipment simply had not evolved at the same pace that group exercise classes had. He continued to pitch potential investors until, many

rejections later, he found a group of investors who believed in Peloton and invested the first $10 million that helped launch the Peloton Bike on a commercial scale.

### III.   Bringing the Peloton Bike to Market

55.    After additional troubleshooting and tinkering on the early prototype bikes, Peloton was ready to take the important step of manufacturing the bike and selling it to its first customers. Peloton held a Kickstarter campaign with the goal of raising enough capital to start manufacturing the bike. As Peloton explained, "[t]his involves building the 'tools' required to create each unique part (yes, we first have to build the machinery that will build the bike!) and pre-purchasing lots of steel, aluminum, plastic, microchips (there are 17 in our console alone)." The Kickstarter campaign raised more than $300,000 and generated initial orders for 188 bikes.

56.    Sales were initially slow—188 bikes was far from Peloton's target, and far from the demand Foley knew existed. Peloton was a new product, and people were wary of the product and how useful it would be. Like every other phase of their journey, Peloton was not going to become successful overnight—they were going to have to work for it. With intensive and creative marketing efforts, including pop-up stores in choice locations, and as word of mouth spread, sales began to pick up.

57.    In January 2014, two years after Peloton was founded, the first bikes were delivered to customers.

58.    By now, Peloton has designed in-house almost everything that other companies outsource to third parties: hardware, software, content, and logistics. As an Inc.com article reported, "Peloton has defied every aspect of the prevailing startup ethos of doing it fast and lean, buying off the shelf, partnering and, above all, custom-building as little as possible."

59.     It is a reality that continues to grow and exceed expectations. In its latest investment round, Peloton raised $550 million at a valuation of $4.15 billion; and on September 26, 2019, Peloton debuted on the NASDAQ stock exchange as a publicly traded company. Peloton continues to expand both nationally and internationally. Most importantly, Peloton is doing what it set out to do—allowing more people than ever to participate in high-energy, state-of-the-art exercise on their own schedule, and empowering members to maximize their most valuable resource: time.

## IV.     Continued Success and Innovation with the Peloton Tread, Bike+, and Tread+

60.     Encouraged by the groundswell of consumer support for the Peloton Bike, Foley and the Peloton team wasted no time in bringing the Peloton experience to a new platform. In 2016, Peloton began developing a treadmill. The finished product, called the Peloton Tread, was introduced to the public in 2018.

61.     The Peloton Tread is a natural extension of the Peloton Bike. Like the Peloton Bike, the Peloton Tread is a sophisticated, internet-integrated exercise system that combines a state-of-the-art treadmill featuring a customized, low-impact, shock-absorbing slat belt, with Peloton's patented interactive technology, allowing users to experience engaging live and on-demand classes with others from the comfort of their own homes.

62.     With its immersive, 32-inch full high-definition, sweat resistant tablet and a 20 watt soundbar, the Peloton Tread was designed to maximize and enhance the ultra-realistic, competition-based, and interactive user interface that people have come to associate with the Peloton experience. Just like on the Peloton Bike, the patented technology on the Peloton Tread allows users to participate in exercise classes led by world-renowned fitness experts and view, on a dynamically-updating leaderboard, how their performance stands, at any given point in a class, against all other users who have taken the class, past or present.

63.     With the Peloton Tread, Peloton dramatically reconceptualized the limits of traditional treadmills in two ways. First, Peloton found a way to turn exercising on a treadmill—usually a solitary enterprise—into a class form with competition. While competitive running has long existed in the form of outdoor or indoor races, Peloton was the first to implement competitive running on at-home treadmills by offering live and on-demand classes with a leaderboard. Prior to the Peloton Tread, it was not well-known for treadmills to offer a leaderboard or comparative display enabling multiple users to see, at every point during the run, how their performance compares to all the other runners that have experienced, or are presently experiencing, the same class.

64.     Second, the Peloton Tread also reimagined the types of workout classes that can be adapted for a treadmill. In addition to classes conducted entirely on the machine, the Peloton Tread offers a panoply of high-energy, instructor-led bootcamp and circuit training options which utilize the features of the Peloton Tread. For example, some classes invite the user to split time between the Peloton Tread and exercises off the Tread that incorporate the user's bodyweight, free weights, and resistance bands. Other classes instruct the user to compete against other users in "free" mode, a setting on the Peloton Tread that disengages the motor and lets the user drive the slat belt, for an intense, truly full body workout.



*Above: The Peloton Tread*



*Above: The Peloton Tread Graphical User Interface and Leaderboard*

65.     Like the Peloton Bike, the Peloton Tread has received numerous accolades for its

innovation. When it premiered at the Consumer Electronics Show, PC Mag named the Peloton

Tread the "Best Health and Fitness Device" of the year. Elle Magazine praised the Peloton Tread

for "technology [that] surpasses any workout machine on the market." GQ named the Peloton

Tread as the best one of the "Best Home Fitness Machines" of 2020.  Similarly, Mashable.com profiled the Peloton Tread and rated it as the best treadmill for runners looking for a new experience.

66.     The Peloton Tread retails for $4,295 (including delivery and set-up) and users pay $39 per month for a subscription to Peloton's exclusive live and on-demand classes.

67.     In 2018, Peloton announced the upcoming release of its next model of Peloton Bike and Peloton Tread devices, the Peloton Bike+ and Peloton Tread+ respectively, to much fanfare from consumers.  Releasing in September 2020, PC Mag named the Peloton Bike+ the "The Best Smart Exercise Bikes for 2021" calling it the "the best smart indoor cycling bike you can buy." The Peloton Tread+ received over 125,000 sales and preorders ahead of its May 2021  U.S. release. Peloton itself has also won countless awards, including being named one of the World's Most Innovative Companies by Fast Company in 2016, 2017, 2018, and 2019, taking the top spot in the "Wellness" category in 2018 and 2019.    In 2020, Peloton was named Retailer of the Year by Forbes.

**V.     Peloton's Acquisition of Precor**

68.     On December 21, 2020, Peloton announced that it would be acquiring Precor, one of the largest global commercial fitness equipment providers, to expand upon Peloton's already remarkable technological and commercial success.

69.     The acquisition was completed on April 1, 2021.  With the acquisition, Peloton cemented its U.S. manufacturing capacity, added nearly 100 dedicated research and development employees to its accomplished R&D team, and expanded Peloton's impressive portfolio of proprietary technology.

23

70.     Seeking to capitalize on its success as an innovator at the nexus of fitness, technology, and media, Peloton undertook the expansion to design and create the next generation of connected fitness equipment and experiences.

71.     As part of this endeavor, Peloton acquired from Precor valuable technology and intellectual property, including the '870 and '755 Patents at issue in this case. The '870 and '755 Patents were assigned to Peloton by Precor effective June 15, 2021.

## VI.     Peloton Values Its Intellectual Property

72.     After years of investment, risk, and innovation, Peloton has become the leader of the at-home fitness world. To protect its technology and intellectual property, Peloton applied for, received, and otherwise acquired several patents covering its inventions, including the patents at issue in this matter.

73.     The '886 Patent, entitled Exercise System and Method, was duly and lawfully issued to Peloton on November 9, 2021. A true and correct copy of the '886 Patent is attached hereto as Exhibit 1.

74.     The '886 Patent is a continuation of U.S. Patent No. 9,174,085, entitled Exercise System and Method, which duly and lawfully issued on November 3, 2015; U.S. Patent No. 9,233,276, entitled Exercise System and Method, which duly and lawfully issued on January 12, 2016; U.S. Patent No. 9,861,855, entitled Exercise System and Method, which duly and lawfully issued on January 9, 2018; U.S. Patent No. 10,022,590, entitled Exercise System and Method, which duly and lawfully issued on July 17, 2018; U.S. Patent No. 10,322,315, entitled Exercise System and Method, which duly and lawfully issued on June 18, 2019; and U.S. Patent No. 10,486,026, entitled Exercise System and Method, which duly and lawfully issued on November 26, 2019.

75.     iFIT Inc. has known about this family of patents since at least June 2018. As of the filing of this complaint, iFIT Inc. has cited Peloton's U.S. Patent No. 9,174,085 and/or U.S. Patent No. 10,022,590 in at least 23 different patent applications.

76.     Since at least March 16, 2020, Peloton has given the public, including iFIT Inc., notice of its patented technology by marking the Peloton Bike and Peloton Tread with a sticker that directs the user to its virtual patent marking website, https://www.onepeloton.com/legal/patents, pursuant to 35 U.S.C § 287(a).

77.     Plaintiff Peloton Interactive, Inc. is the current owner of all rights, title, and interest in the '886 Patent. The Peloton Bike and Peloton Tread practice the '886 Patent because, among other things, Peloton provides a network system comprising a plurality of exercise devices connected to a network, enabling users to participate in previously recorded on-demand exercise classes. Peloton's on-demand exercise classes include exercise content and a synchronizing signal that indicates a starting point and an ending point for collecting performance parameters associated with users' exercise performance during a portion of the on-demand exercise class. The synchronization signal enables synchronization of the collected performance parameters. Peloton's bikes and treads comprise sensors for measuring the performance parameters associated with the users' exercise performance. Peloton's system comprises control stations for collecting and synchronizing live performance parameters during a live session of the on-demand exercise class. The control stations perform those functions by providing the exercise content and the at least one synchronizing signal to the plurality of exercise devices during the live session of the on-demand exercise class; collecting the live performance parameters during the live session of the on-demand exercise class from the starting point indicated in the at least one synchronizing signal; synchronizing the live performance parameters collected during the live session of the on-demand

exercise class according to the at least one synchronizing signal; and providing the synchronized live performance parameters to the plurality of exercise devices thereby enabling the plurality of users associated with the live performance parameters to participate with each other during the live session of the on-demand exercise class.

78.     Peloton thus manufactures and sells a commercial embodiment of the '886 Patent, including the Peloton Bike, Peloton Bike +, Peloton Tread, and Peloton Tread + with a subscription to Peloton classes.

79.     The '406 Patent, entitled "Exercise System and Method," was duly and lawfully issued to Peloton on December 15, 2020.  A true and correct copy of the '406 Patent is attached hereto as Exhibit 2.

80.      The '870 Patent, entitled "Exercise Guidance System," was duly and lawfully issued to Precor on September 9, 2014, and assigned to Peloton by Precor effective June 15, 2021. A true and correct copy of the '870 Patent is attached hereto as Exhibit 3.

81.     The '755 Patent, entitled "Adjustable Exercise Device," was duly and lawfully issued to Precor on May 10, 2011, and assigned to Peloton by Precor effective June 15, 2021.  A true and correct copy of the '755 Patent is attached hereto as Exhibit 4.

82.     Peloton Interactive, Inc. is the current owner of all rights, title, and interest in the '886 Patent, the '406 Patent, the '870 Patent, and the '755 Patent.

## VII.   The Asserted Patent Recite Inventive Concepts That Were Not Well-Understood, Routine, Or Conventional, At The Time

### a.     The '886 Patent

83.     As described herein, the Peloton Bike, Peloton Tread and Peloton's system technology are revolutionary, category-creating devices that: (1) solved significant problems in the prior art; (2) experienced immense market success; (3) received near-universal market praise;

26

(4) overcame significant technological hurdles in development; and (5) overcame initial market reservations about viability. The Peloton Bike, Peloton Tread, and Peloton's systems implemented inventive concepts that were not well-understood, routine, or conventional at the time they were developed. These inventive concepts are incorporated into the claims of the '886 Patent. It is the inventive concepts contained in the claims of the '886 Patent that account for the leaps-and-bounds improvement achieved by the Peloton Bike and Peloton Tread over the prior art, as well as Peloton's resulting economic success.

84.     The '886 Patent describes and claims concepts that were not well-understood, routine, or conventional at the time of the '886 Patent.

85.     For example, Claim 1 of the '886 Patent describes a "network system comprising: a plurality of exercise devices connected to a network, the plurality of exercise devices enabling a plurality of users to participate in a previously recorded on-demand exercise class led by at least one instructor" Claim 1 of the '886 Patent further describes that the "the on-demand exercise class includes exercise content and at least one synchronizing signal that indicates a starting point and an ending point for collecting performance parameters associated with users' exercise performance during at least a portion of the on-demand exercise class and the at least one synchronizing signal enables synchronization of the collected performance parameters." As described above, this alone represents an unconventional improvement over the prior art, because prior art in-studio classes did not offer any capability for a user to access and participate in on-demand exercise classes, let alone the capability for multiple users to participate concurrently in at least a portion of the same on-demand exercise class, wherein their performance parameters are synchronized. And it was not well-understood, routine, or conventional to provide a home exercise device, such as a bike, with networked access to on-demand exercise classes. By providing remote users with networked

access to on-demand exercise classes, the '886 Patent allowed remote users to have the experience of an in-studio exercise class, in the comfort of their own home and on whatever schedule they chose. This offering was a major advancement over both live in-studio classes and at-home exercise machines in existence at that time. Further, the specification of the '886 Patent details this advancement. *See, e.g.*, Exhibit 1:50-2:17, 13:35-14:27.

86.     Claim 1 of the '886 Patent also describes "sensors associated with the plurality of exercise devices, the sensors measuring the performance parameters associated with the users' exercise performance," and "a control station collecting and synchronizing live performance parameters during a live session of the on-demand exercise class." Claim 1 of the '886 Patent describes the operation of the control station as including "collecting the live performance parameters during the live session of the on-demand exercise class from the starting point indicated in the at least one synchronizing signal; synchronizing the live performance parameters collected during the live session of the on-demand exercise class according to the at least one synchronizing signal; and providing the synchronized live performance parameters to the plurality of exercise devices thereby enabling the plurality of users associated with the live performance parameters to participate with each other during the live session of the on-demand exercise class." These functionalities, which allowed remote users taking a live session of a previously recorded on-demand class to experience the feeling of "live" competition with each other and hundreds, or even thousands, of previous riders, was revolutionary at the time, and critical to solving the "rider boredom" problem described in this Complaint. No prior art system allowed a user to do that, whether at home or in-studio. The specification of the '886 Patent also details this advancement over the prior art. *See, e.g.*, Exhibit 1:50-2:17, 13:35-58.

28

87.     Independent Claim 26 and 27 of the '886 Patent recites unconventional technological advancements over the prior art that are similar to the unconventional technological advancements recited in independent Claim 1.

88.     Independent Claim 19 of the '886 Patent recites unconventional technological advancements over the prior art that are similar to the unconventional technological advancements recited in independent Claim 1. Independent Claim 19 adds additional inventive concepts to what is recited in Claim 1. For example, Claim 19 further recites "maintaining, at a storage device, the synchronized live performance parameters associated with the users' exercise performance with the exercise content for the on-demand exercise class," and "during a subsequent session of the on-demand exercise class, providing the maintained synchronized live performance parameters to an exercise device." As an example, this functionality can permit on-demand exercise classes to include an ever-increasing number of participants.

89.     Independent Claim 19 further recites "maintaining at least one live performance parameter of a user as private, wherein the at least one live performance parameter maintained as private is not distributed to other users during the subsequent session of the on-demand exercise class." As an example, this functionality can permit users to identify certain parameters that are not to be shared with other users.

90.     The dependent claims of the '886 Patent add additional inventive concepts to what is recited in independent Claims 1 and 19, and offer further unconventional improvements over the prior art, both alone and in combination, which result in increased motivation and engagement for users.

91.     Claim 4 of the '886 Patent further recites "display[ing] a visual comparison representative of the synchronized live performance parameters for a user participating in the live

29

session of the on-demand exercise class." Claim 5 adds that "visual comparison representative of the live performance parameters from the plurality of users is a leaderboard." Having a system that could display a visual comparison of user data collected during a live session of a previously recorded on-demand exercise class and/or that could perform this leaderboard functionality for such an on-demand exercise class was revolutionary. Dependent Claim 22 of the '886 Patent recites essentially the same functionality as claim 4 and was also unconventional. The specification of the '886 Patent also details this advancement over the prior art. *See, e.g.*, Exhibit 1 at 8:48-56.

92.     As another example, Claim 9 of the '886 Patent further recites "maintaining the synchronized live performance parameters collected during the live session of the on-demand exercise class, wherein the synchronized live performance parameters are used in a subsequent session to enable ghost participants." As discussed above with respect to claim 19, this functionality can permit, among other things, on-demand exercise classes to include an ever-increasing number of participants. Each subsequent live session of an on-demand exercise class adds the current user's performance parameters to the synchronized performance parameters of previous users who have taken that class. The specification of the '886 Patent details this advancement over the prior art as well. *See, e.g.*, Exhibit 1 at 13:35-58.

93.     Other claims of the '886 Patent describe particular variations of the leaderboard including particular ways in which that information should be displayed and updated. *See* Claims 6, 7, and 8. These concepts, as well, were not well-understood, routine, or conventional at the time of the invention of the '886 Patent.

94.     Far from an abstract idea, the claims of the '886 Patent are also directed to a tangible system with an observable real-world impact. Indeed, the '886 Patent claims physical and concrete devices that carry forward the inventive concepts described above. For example, Claim 1

incorporates "a plurality of exercise devices" and "sensors" to measure the previously described performance parameters. As another example, Claim 1 further incorporates a "control station " to collect and synchronize live performance parameters, and to provide exercise content and at least one synchronizing signal to the plurality of exercise devices. Dependent Claim 13, as another example, specifically discloses the use of a "stationary exercise devices." These physical devices create an improved tangible exercise system, such as a network-connected stationary at-home bike or treadmill.

  b.    The '406 Patent

95.    The '406 Patent describes and claims concepts that were not well-understood, routine, or conventional at the time of the '406 Patent.

96.    For example, independent Claim 11 of the '406 Patent describes a method for synchronizing data among different remote users participating in the same live or on-demand exercise class with varying workout segments comprising, among other things, "causing, on a first display associated with a first treadmill, a first portion of an exercise class to be displayed with a segmented timeline, the segmented timeline including first indicia indicating a first activity to be performed during the first portion of the exercise class and second indicia indicating a second activity to be performed during a second portion of the exercise class" while remote users participate in that class.  This alone represents an unconventional improvement over the prior art, because prior art in-studio classes did not offer any capability for a user to access and participate in live or archived exercise classes.  And it was not well-understood, routine, or conventional to provide a home treadmill system with networked access to live or archived exercise classes.  By providing remote users with networked access to live or archived exercise classes, the '406 Patent allowed remote users to have the experience of an in-studio exercise class, in the comfort of their own home and on whatever schedule they chose.  This offering was a major advancement over

both live in-studio classes and at-home exercise machines in existence at that time.  Further, the specification of the '406 Patent details these advancements.  *See, e.g.*, Exhibit 2 at 1:20-54.

97.     Claim 11 of the '406 Patent also describes, in accordance with the claimed method, "receiving information indicative of a first performance parameter detected by a sensor associated with the first treadmill, the first performance parameter being associated with a first user running on a belt of the first treadmill during display of the first portion of the exercise class on the first display;" "receiving, via a network, information indicative of a second performance parameter associated with a second user, the second performance parameter being detected at a second treadmill during display of the first portion of the exercise class on a second display associated with the second treadmill, the second treadmill being located at location remote from the first treadmill;" and "causing the second performance parameter to be displayed on the first display together with the first performance parameter and the segmented timeline."  These functionalities, which allowed remote users taking a live or archived treadmill class with multiple workout segments or intervals to experience the feeling of "live" competition with hundreds, or even thousands, of previous runners, updated across a variety of performance metrics for each portion or segment in the class, was revolutionary at the time, and critical to solving the "user boredom" problem described in this Complaint and the '406 Patent specification.  *See, e.g.*, Exhibit 2 at 1:20-54; 23:47-24:34.  Independent Claim 16 of the '406 Patent recites unconventional technological advancements over the prior art that are similar to the unconventional technological advancements recited in independent Claim 11, and additionally includes further advancements over the prior art.

98.     The dependent claims of the '406 Patent add additional inventive concepts to what is recited in independent 11, and offer further unconventional improvements over the prior art, both alone and in combination, which result in increased motivation and engagement for users.

99.     For example, Claim 14 of the '406 Patent recites the method of Claim 16, further comprising "determining an amount of energy expended by the first user while running during the first portion of the exercise class" and "causing the amount of energy to be displayed on the first display together with the first portion of the exercise class."  This claim adds to the underlying claims the additional inventive concept of determining the amount of energy exerted by the user and displaying the amount to the user during various portions of an exercise class, allowing a user to compare their performance metrics or compete against other users over each portion of the varied exercise class.  The specification of the '406 Patent also details this advancement over the prior art.  *See, e.g.*, Exhibit 2 at 1:20-54; 23:47-24:34.

100.     As another example, Claim 19 of the '406 Patent recites the method of Claim 16, further comprising "providing first video chat data to the first treadmill, wherein the first treadmill is configured to display, in substantially real-time, the first portion of the exercise class and the first video chat data" and "providing second video chat data to the second treadmill, wherein the second treadmill is configured to display, in substantially real-time, the first portion of the exercise class and the second video chat data."  This claim adds to the underlying claims the additional inventive concept of providing content of an exercise class alongside video chat content for real-time display.  As an example, this functionality can permit two people in different locations to take a class at the same time and to communicate with and compete against each other during an exercise class, where each user is provided with the segmented timeline indicating the portions of the class, their respective performance parameters during each portion of the class, and video chart data, displayed in real-time.  Having a system with this capability is a major advancement over both in-studio treadmill classes and existing at-home exercise equipment, and is far from "well-

understood, routine, or conventional."   The specification of the '406 Patent details this advancement over the prior art.  *See, e.g.*, Exhibit 2 at 1:20-54; 23:47-24:34.

101.    Far from an abstract idea, the claims of the '406 Patent are also directed to a tangible system and method with an observable real-world impact.  Indeed, the '406 Patent claims physical and concrete devices and methods that carry forward the inventive concepts described above.  For example, Claim 11 incorporates "a first treadmill" with an associated "first display" and "a sensor associated with the first treadmill" and a "second treadmill" at a remote location with a "second display" to present the live or archived exercise class with multiple workout segments or portions, detected performance parameters, and segmented timeline detailing the exercise class portions. The dependent claims add further physical components for performing the claimed methods. For example, Claim 12 further recites "a deck of the first treadmill," "a belt rotatably connected to the deck," and "a first motor located substantially internal to the deck" responsive to user input.  These physical devices create an improved tangible exercise system and method, such as an in-home treadmill system.

### c.    The '870 Patent

102.    The '870 Patent describes and claims concepts that were not well-understood, routine, or conventional at the time of the '870 Patent.

103.    For example, Claim 1 of the '870 Patent describes a method for dynamically adjusting users' workouts comprising, among other things, "identifying and storing an exercise route for achieving [a] objective using one or more exercise devices, the route including prescribed workout parameters for more than one workout;" "receiving exercise metrics from a first workout and a second workout subsequent to the first workout;" and "forming a comparison of the exercise metrics with the exercise route to adjust the recommended workout parameters for the second workout of the route based on the comparison."   This alone represents an unconventional

34

improvement over the prior art, because prior art exercise systems and methods did not offer any capability for a user to have their workouts automatically and dynamically adjusted and personalized using a feedback loop based on their base workout performance.  It was not well-understood, routine, or conventional to provide a comprehensive exercise solution that goes above and beyond the workout personalization afforded by even a personal trainer and dynamically customizes each workout in a series based on the detected workout metrics and parameters of each preceding workout.  By providing users with individually customized and adjusted workouts using all user data and input available, the '870 Patent allows users to have an in-home or on-the-go experience that exceeds the capabilities of any other fitness personalization options available at the time, wherever and whenever the user desires.  This offering was a major advancement over both human and computer-implemented workout programs and personalization methods and systems in existence at the time.   Further, the specification of the '870 Patent details this advancement.  *See e.g.*, Exhibit 3 at 1:15-55; 6:16-31; 7:6-14.

104.    Claim 14 of the '870 Patent also describes, in accordance with the claimed method, displaying the adjusted exercise program to the user, thereby allowing a user to be aware of and take complete control of their own personalized exercises and workout program.

105.    Independent Claim 1 of the '870 Patent describes a system reciting unconventional technological advancements over the prior art that are similar to the unconventional technological advancements recited in independent Claim 14.

106.    The dependent claims of the '870 Patent add additional inventive concepts to what is recited in independent Claims 1 and 14, and offer further unconventional improvements over the prior art, both alone and in combination, which result in increased motivation and engagement for users.

107.    For example, Claim 5 of the '870 Patent recites the system of Claim 1 "wherein the computer readable program is configured to adjust the route based on a degree of compliance with workout types, frequency, intensity, and duration parameters of the route."  This claim adds to the underlying claims the additional inventive concept of adjusting and customizing a workout plan based on metrics measuring a user's input during or alterations to previous workouts, a feat that even the most diligent personal trainer would struggle to emulate.  Claims 8, 18, and 19 of the '870 Patent recites similar functionality and was, likewise, unconventional.  As an example, this functionality can permit a user to tweak or adjust the intensity, frequency, schedule, or duration of workouts to meet their own needs and desires, which the claimed system and method will detect, respond to, and personalize future workouts accordingly.  Having a system with this capability is a major advancement over existing human and computer-implemented workout programs and personalization methods and systems and is far from "well-understood, routine, or conventional." *See e.g.*, Exhibit 3 at 1:15-55; 6:16-31; 7:6-14.

108.    Far from an abstract idea, the claims of the '870 Patent are also directed to a tangible system and method with an observable real-world impact.  Indeed, the '870 Patent claims physical and concrete devices and methods that carry forward the inventive concepts described above.  For example, Claim 1 incorporates "a first exercise device of a first type," "a display," and "a computer readable program" to perform the claimed adaptive workout customization and modification features.  Likewise, Claim 14 incorporates "one or more exercise devices," "a persistent storage device," and a display.  Dependent Claims 12 and 13, as another example, specifically disclose the use of an "elliptical device" and a second different "cardio trainer" device specifically.  These physical devices create an improved tangible exercise system and method.

### d.    The '755 Patent

109.    The '755 Patent describes and claims concepts that were not well-understood, routine, or conventional at the time of the '755 Patent.

110.    For example, Claim 1 of the '755 Patent describes a treadmill system that improves the operation and efficiency of the treadmill motor and roller assembling comprising, among other things, "an improvement comprising an air dam located between the motor compartment and the roller assembly and connected to the frame;" "the air dam extending generally a majority length of the roller and substantially isolating the motor compartment from the endless belt;" and "whereby the air dam substantially reduces airflow and cross-contamination of debris between the endless belt and the motor compartment."  This alone represents an unconventional improvement over the prior art, because prior art treadmill systems did not offer a suitable solution to address the tendency for debris to pass between the endless belt and the motor compartment.  Such debris can interfere with the workings of the motor compartment components and the endless belt.  It was not well-understood, routine, or conventional to provide an improvement to treadmill components and hardware that directly addresses this issue.  This improvement was a significant advancement over treadmill component designs and systems in existence at the time.  Further, the specification of the '755 Patent details this advancement.  *See e.g.*, Exhibit 3 at 1:11-2:22.

111.    Far from an abstract idea, the claims of the '755 Patent are also directed to a tangible system and method with an observable real-world impact.  Indeed, the '755 Patent claims physical and concrete devices and methods that carry forward the inventive concepts described above.  For example, Claim 1 of the '755 describes a distinct treadmill design and associates components including "a frame, a motor compartment, a roller assembly located adjacent the motor compartment, and an endless belt entrained about the roller assembly" in addition to the inventive air dam improvement that addresses the problem identified in the prior art.

37

## VIII.   iFIT Inc.'s Machines With iFIT Functionality Infringe Peloton's Patents

### a.      The '886 Patent

112.     Because of Peloton's success, competitors have brought copycat products to market that infringe on Peloton's intellectual property.

113.     Until recently, iFIT Inc. hosted only pre-recorded, on-demand classes on its machines via iFIT, and did not offer any way for its users to compare their performance during an on-demand class to others who had previously taken or were currently taking the same class.

114.     In September 2019, many years after Peloton pioneered the Peloton leaderboard, iFIT Inc. made an announcement on the Official iFIT Member Page on Facebook that it would be releasing a "new" feature, the iFIT leaderboard. In that announcement, iFIT Inc. explained that "[w]ith the new iFIT leaderboard you'll be able to compete with friends, the iFIT community, or against yourself." A post from Chase Watterson, a marketing director for iFIT, included a photo of the iFIT leaderboard in beta testing, which advised that the user can "[w]atch the competition in real time."

115.     In January 2020, iFIT Inc. launched an ad campaign titled "The Duel." "The Duel" is a video advertisement demonstrating the competitive and engaging nature of the iFIT leaderboard on NordicTrack's Commercial S22i Studio Cycle Bike. The advertisement shows two actors riding their NordicTrack bikes at the same time and competing to outrace each other for a higher position on the iFIT leaderboard. The iFIT leaderboard iFIT Inc. advertised in "The Duel" is an almost exact copy of Peloton's leaderboard.

38



*Above: Image of iFIT Inc.'s "The Duel" advertisement displaying the copycat iFIT Leaderboard on an iFIT Inc. bike*

116.    iFIT Inc. markets the iFIT leaderboard by claiming for itself the competitive, real-time, at home leaderboard technology that Peloton pioneered and patented. iFIT Inc. touts that the iFIT leaderboard lets users "[r]ace against friends, family, and even yourself with our all-new, intelligent, competitive feature." Similarly, promotional text for "The Duel" advertises that, "[w]ith NordicTrack, you get a personal trainer in your home... Ride your way to the top of the iFIT leaderboard..."

117.    Concomitant with "The Duel," iFIT Inc. implemented the iFIT leaderboard across all iFIT products with iFIT functionality, including its treadmills, incline trainers, ellipticals, rowers, and HIIT machines sold under the brand names NordicTrack, ProForm, and FreeMotion. As of the filing of this Complaint, at least 55 models of iFIT Inc. products utilize the iFIT leaderboard.

118.    With the launch of the iFIT leaderboard, iFIT Inc. and its products with iFIT functionality infringe at least Claim 1 of the '886 Patent by, among other things, providing a

network system comprising a plurality of exercise devices connected to a network, enabling users to participate in previously recorded on-demand exercise classes, which include exercise content and, on information and belief, a synchronizing signal that indicates a starting point and an ending point for collecting performance parameters associated with users' exercise performance during a portion of the on-demand exercise class. iFIT products comprise sensors for measuring the performance parameters associated with the users' exercise performance.  Further, iFIT Inc.'s systems include control stations that collect and synchronize live performance parameters during a live session of the on-demand exercise class and provide the synchronized live performance parameters to the plurality of exercise devices.

119.   As recited by Claim 1 of the '886 Patent, iFIT Inc., and iFIT products with iFIT functionality provide a "network system comprising: a plurality of exercise devices connected to a network, the plurality of exercise devices enabling a plurality of users to participate in a previously recorded on-demand exercise class led by at least one instructor, wherein the on-demand exercise class includes exercise content and at least one synchronizing signal that indicates a starting point and an ending point for collecting performance parameters associated with users' exercise performance during at least a portion of the on-demand exercise class and the at least one synchronizing signal enables synchronization of the collected performance parameters."  For example, iFIT Inc., and iFIT products with iFIT functionality provide a network system that includes a many different exercise devices connected to a network.



*Above: ProForm's Website's iFIT Page, last accessed November 11, 2021*

120.    Additionally, iFIT Inc., and iFIT products with iFIT functionality enable users to participate in a previously recorded iFIT exercise class led by an instructor.



*Above: NordicTrack's Website's iFIT Page, last accessed November 11, 2021*

121.    Further, iFIT Inc., and iFIT products with iFIT functionality collect workout statistics and metrics associated with iFIT users during iFIT exercise classes.  On information and belief, iFIT Inc., and iFIT products with iFIT functionality provide at least one synchronizing signal that indicates a starting point and an ending point for collecting performance parameters associated with users' exercise performance during at least a portion of the on-demand exercise class and enables synchronization of the collected performance parameters.



*Above: iFIT's Leaderboard Page, last accessed November 11, 2021*



## TRACK YOUR STATS

Real-time performance stat tracking that is perfect for keeping you motivated and engaged.

*Above: iFIT's NordicTrack Website's Commercial X32i Treadmill Page, last accessed*

*November 11, 2021*





**Interactive Training Sessions**

iFIT trainers move your transformation forward by interacting with and controlling the Pro 9000's speed, incline, and decline.

**Streaming Global and Studio Class Workouts**

See the world while you run through cities and trails, or get pushed in a studio class, all led by personal trainers in your home.

**Connected Fitness Tracking**

Check your progress as every training session is automatically recorded and even used to influence future fitness plans.

*Above: iFIT's ProForm Website's Pro 9000 Treadmill Page, last accessed November 11, 2021*

122.    As further recited by Claim 1 of the '886 Patent, iFIT Inc., and iFIT products with iFIT functionality provide "sensors associated with the plurality of exercise devices, the sensors measuring the performance parameters associated with the users' exercise performance.".   For example, iFIT Inc., and iFIT products with iFIT functionality include sensors that detect or measure workout statistics and metrics of users during iFIT classes.



## TRACK YOUR STATS

Real-time performance stat tracking that is perfect for keeping you motivated and engaged.

*Above: iFIT's NordicTrack Website's Commercial X32i Treadmill Page, last accessed*

*November 11, 2021*

43



*Above: iFIT's Leaderboard Page, last accessed November 11, 2021*

123.    As further recited by Claim 1 of the '886 Patent, iFIT Inc., and iFIT products with iFIT functionality provide "a control station collecting and synchronizing live performance parameters during a live session of the on-demand exercise class by: providing the exercise content and the at least one synchronizing signal to the plurality of exercise devices during the live session of the on-demand exercise class."  For example, as part of iFIT's leaderboard feature, iFIT Inc., and iFIT products with iFIT functionality collect and synchronize the workout statistics and metrics of users currently taking an iFIT class during the playback and performance of the on iFIT products with iFIT functionality.  On information and belief, iFIT Inc., and iFIT products with iFIT functionality provide at least one synchronizing signal to the plurality of exercise devices during exercise class.



## LIVE WORKOUT LEADERBOARD

Compete and push yourself in real-time.

*Above: NordicTrack's Website's iFIT Page, last accessed November 11, 2021*



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality,*

*showing iFIT's live leaderboard feature*

124.    As further recited by Claim 1 of the '886 Patent, iFIT Inc., and iFIT products with iFIT functionality provide "a control station collecting and synchronizing live performance parameters during a live session of the on-demand exercise class by: collecting the live performance parameters during the live session of the on demand exercise class from the starting point indicated in the at least one synchronizing signal."  For example, as part of iFIT's leaderboard feature, iFIT Inc., and iFIT products with iFIT functionality collects workout statistics and metrics of live users throughout the class.  On information and belief, the workout statistics and metrics of users currently taking the iFIT class are collected from a starting point indicated by at least one synchronizing signal.



*Above: iFIT's Leaderboard Page, last accessed November 11, 2021*

125.    As further recited by Claim 1 of the '886 Patent, iFIT Inc., and iFIT products with iFIT functionality provide "a control station collecting and synchronizing live performance parameters during a live session of the on-demand exercise class by: synchronizing the live performance parameters collected during the live session of the on-demand exercise class according to the at least one synchronizing signal." For example, as part of iFIT's leaderboard feature, iFIT Inc., and iFIT products with iFIT functionality synchronize the workout statistics and metrics of users currently taking an iFIT class so that users can compete "in real-time."

47



## LIVE WORKOUT LEADERBOARD

Compete and push yourself in real-
time.

*Above: NordicTrack's Website's iFIT Page, last accessed November 11, 2021*

## The Leaderboard

When you join a Live Workout, you're competing in real time with other members on the iFIT Leaderboard! There are filter options within the Leaderboard, so you can choose which members you see during your workout. For example, you can filter by age or gender.

*Above: iFIT's Website's Live Workouts Page, last accessed November 11, 2021*

126.    Finally, as recited by Claim 1 of the '886 Patent, iFIT Inc., and iFIT products with iFIT functionality provide "a control station collecting and synchronizing live performance parameters during a live session of the on-demand exercise class by: providing the synchronized live performance parameters to the plurality of exercise devices thereby enabling the plurality of users associated with the live performance parameters to participate with each other during the live session of the on-demand exercise class."  For example, iFIT Inc., and iFIT products with iFIT

48

functionality provide iFIT users currently participating in a class with the workout statistics and metrics of other users concurrently taking the class in order to compete against each other in real-time



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality, showing iFIT's live leaderboard feature*

127.    The above examples of how iFIT products directly infringe Claim 1 of the '886 Patent are non-limiting and based on information currently available to Peloton. In particular, additional aspects of iFIT products may be identified that meet the limitations of Claim 1 of the '886 Patent, additional claims of the '886 Patent may be determined to be infringed, and additional

iFIT products may be identified as infringing once additional non-public information is provided through the course of discovery.

128.    On information and belief, iFIT Inc., directly infringes the '886 patent at least by using iFIT products with iFIT functionality in an infringing manner during iFIT Inc.'s testing, developing, or other operation of such products in the United States.

129.    iFIT Inc., also actively, knowingly, and intentionally induces infringement of one or more claims of the '886 Patent under 35 U.S.C. § 271(b) by actively encouraging others, including at least iFIT's customers, to use iFIT products with iFIT functionality in an infringing manner.  iFIT Inc., provides significant support and documentation, such as manuals, guides, webpages, and videos that demonstrates how its products with iFIT functionality can be used. (*See,* *e.g.,* https://www.ifit.com/equipment; https://www.nordictrack.com/ifit; https://www.proform.com/ifit).    For example, through its webpages, manuals, and other documentation highlighting iFIT's live classes and leaderboard, iFIT Inc., encourages and instructs its customers to use its products in a manner that infringes the '886 Patent:



*Above: NordicTrack Website's iFIT Page, last accessed November 11, 2021*

# Tune In and Tone Up—LIVE!

Live workouts are available on treadmills, bikes, and the tablet version of the iFIT app. Join the iFIT Community for high-energy workouts as our world-class personal trainers automatically adjust your machine in the moment.




**INDOOR/OUTDOOR WORKOUTS**

Join trainers in their homes and on their favorite neighborhood trails.

**LIVE WORKOUT LEADERBOARD**

Compete and push yourself in real-time.

*Above: NordicTrack Website's iFIT Page, last accessed November 11, 2021*

130.    iFIT Inc., also induces infringement of the '886 Patent by their customers by configuring iFIT products with iFIT functionality to operate in a manner that iFIT knows infringes the '886 Patent.  iFIT Inc., provides its customers with all the requisite hardware, software, and instructions to use iFIT products with iFIT functionality in an infringing manner.  For example, iFIT Inc., provides its products with iFIT functionality to customers equipped with iFIT software and an iFIT subscription, which encourage and instructs the customers to use the products in a manner that infringes the '886 Patent:

**Bring the full training experience to your home.**

— iFIT trainers automatically adjust the treadmill for you, changing speed and incline as you work out.

— Get motivation, education, and entertainment with countless studio classes and outdoor workouts led by professional trainers.

— Includes an iFIT Family membership for a full 30 days of streaming live and on-demand fitness ($39 value on us).

A credit/debit card is required to activate this offer. iFIT membership will automatically renew at then-current rates (currently $39 USD per month) plus tax after 30-Days, unless canceled in advance.

*Above: iFIT's ProForm Website's Pro 9000 Treadmill Page, last accessed November 11, 2021*



*Above: iFIT's ProForm Website's Pro 9000 Treadmill Page, last accessed November 11, 2021*



*Above: iFIT's NordicTrack Website's Commercial X32i Treadmill Page, last accessed*

*November 11, 2021*

131.    iFIT Inc., further actively, knowingly, and intentionally contributorily infringes one or more claims of the '886 Patent under 35 U.S.C. § 271(c) by knowingly making, selling, and/or offering to sell in the United States, and/or importing into the United States iFIT products with iFIT functionality.  These products are a material part of practicing at least the methods of Claim 1 of the '886 Patent, have no substantial non-infringing uses, are not a staple article of commerce, and are specially made and adapted for use in an infringing manner.  For example, iFIT products with iFIT functionality are specifically designed and intended to connect a plurality of exercise devices, allowing users to participate in on-demand exercise classes, the servers collecting a remote user's performance parameters, and synchronizing that remote user's performance against the performance of other remote users participating in a live session of an on-demand exercise class.

132.    Upon information and belief, iFIT Inc., has been aware of Peloton and of its proprietary technologies and intellectual property assets as evidenced by iFIT and Peloton's

history of intellectual property disputes and litigations.  Apart from this knowledge, iFIT has had knowledge of the '886 Patent since at least the filing of this lawsuit.

133.    iFIT Inc. markets the iFIT products by informing users that they can "Get the full studio experience without leaving your home," and further claims that its interactive leaderboard allows users to "Compete against the class or just yourself with an interactive, real-time Leaderboard."

134.    iFIT Inc. also advertises that members of its interactive fitness subscribers "can take advantage of over 60 live and on demand training categories."

135.    iFIT Inc.'s pivot to copying Peloton's interactive technology is no accident. iFIT Inc. directly competes with Peloton in the at-home fitness equipment space. Finding middling success with its previous iFIT offerings, iFIT Inc. decided instead to roll out a "new" leaderboard feature—in fact, a feature copied from Peloton—to try and boost sales of its own machines after watching Peloton's rise to the top of the fitness industry. However "new" the leaderboard might have been to the iFIT Inc. machines, the leaderboard is a well-established touchstone of the Peloton Bike and Peloton Tread experience, and it was the Peloton experience that iFIT Inc. intended to invoke with its "new" feature.

136.    iFIT Inc.'s infringement of Peloton's patented technology has been intentional and knowing.

137.    In fact, iFIT Inc. has drawn direct comparisons between its products and the Peloton Bike, demonstrating its intimate familiarity with Peloton's patented technology.

138.    For example, iFIT Inc. uploaded a video on its NordicTrack YouTube channel on December 31, 2018. The video, titled "Peloton Bike Vs. NordicTrack Bike," features an iFIT

personal trainer who advises the viewer which bike to buy: a NordicTrack bike, or the Peloton Bike.



*Above: iFIT Inc.'s comparison advertisement, last accessed May 11, 2020*

139.    In May 2020, iFIT Inc. decided to misappropriate yet another Peloton innovation for itself. This time, iFIT Inc. took aim at Peloton's live classes. On May 11, 2020, iFIT Inc. announced that it, too, would begin offering live classes. Like Peloton, iFIT Inc. equipped its live classes with real-time leaderboard functionality. Also, like Peloton, iFIT Inc. would offer live classes on bikes and treadmills. iFIT Inc.'s decision to roll out live leaderboard classes for only two of its product lines is as strategic as it is telling. Although iFIT Inc. operates iFIT on everything from ellipticals to rowers, iFIT Inc. chose to implement live classes for the only two types of hardware in which Peloton directly competes—i.e., bikes and treadmills—in order to unlawfully divert sales away from the Peloton Bike and the Peloton Tread.

140.    iFIT Inc.'s live class announcement only further highlights the dramatic steps iFIT Inc. took to replicate Peloton. iFIT Inc.'s announcement touts that users can now "compete in realtime on the iFIT Leaderboard!" It also advises that the iFIT Leaderboard has new filters, specifically for Live Workouts, including a "Right Now" filter that shows all the users who are presently taking the class—much like Peloton's "Here Now" filter. A simple comparison of the two reveals that every aspect of the iFIT Leaderboard is derived from Peloton's leaderboard—from the user interface and display, to the metrics selected for presentation, to the ability to filter between all users who have ever taken the class and those who are "Here Now."



*Above: Image of the copycat iFIT Leaderboard from iFIT Inc.'s May 11, 2020 announcement*

141.    As iFIT Inc.'s imitative conduct and its YouTube advertisement illustrate, iFIT Inc. implemented the iFIT leaderboard with full knowledge of Peloton's exercise offerings and its patented technology.

142.    iFIT Inc. actively markets and sells iFIT products with iFIT functionality to customers across the United States, including in the State of California and the District of Delaware.

143.    iFIT products with iFIT functionality are also available for purchase on websites managed by iFIT Inc. iFIT Inc. offers to ship iFIT products with iFIT functionality to any location in the United States.

144.    iFIT Inc. and iFIT products with iFIT functionality (which include the following: ProForm Pro 9000 Treadmill, ProForm Pro 2000 Treadmill, ProForm Carbon T10 Treadmill, ProForm Carbon T7 Treadmill, ProForm City L6 Treadmill, ProForm Studio Bike Pro 22, ProForm Studio Bike Pro, ProForm Carbon CX Studio Bike, ProForm 440 ES Recumbent Bike, ProForm 8.0 EX Upright Bike, ProForm Studio Bike Limited, ProForm 750R Rower, ProForm Pro R10 Rower, ProForm 759R Rower, ProForm Carbon HIIT H14 Elliptical, ProForm Carbon HIIT H7 Elliptical, ProForm Carbon E7 Elliptical, ProForm Carbon EL Elliptical, ProForm Hybrid Trainer XT Elliptical, NordicTrack Commercial X321 Incline Trainer, NordicTrack Commercial X22i Incline Trainer, NordicTrack Commercial 1750 Treadmill, NordicTrack Commercial 2450 Treadmill, NordicTrack Commercial 2950 Treadmill, NordicTrack T 6.5 Si Treadmill, NordicTrack EXP 7i Treadmill, NordicTrack EXP 10i Treadmill, NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack Commercial VR25 Recumbent Bike, Nordictrack Commercial R35 Recumbent Bike, NordicTrack Commercial VU 19 Upright Bike, NordicTrack Commercial VU 29 Upright Bike, NordicTrack FS14i Elliptical, NordicTrack FS10i Elliptical, NordicTrack Commercial 9.9 Elliptical, NordicTrack Commercial 14.9 Elliptical, NordicTrack Commercial SpaceSaver SE9i Elliptical, NordicTrack Commercial SpaceSaver SE7i Elliptical,

NordicTrack Fusion CST Pro, NordicTrack Fusion CST Pro with Rower, NordicTrack RW900 Rower, NordicTrack RW700 Rower, NordicTrack RW500 Rower, FreeMotion t22.9 Reflex Treadmill, FreeMotion i22.9 Incline Trainer, Freemotion T10.9b Reflex Treadmill, FreeMotion e22.9 Elliptical, Freemotion E10.9b Elliptical, FreeMotion CoachBike, FreeMotion r22.9 Recumbent Bike, FreeMotion u22.9 Upright Bike, and Freemotion R10.96b Recumbent Bike) satisfy each and every limitation of one or more claims of the '886 Patent.

### b. The '406 Patent

145.    iFIT Inc., and iFIT treadmill products with iFIT functionality infringe at least Claim 11 of the '406 Patent by, among other things, displaying treadmill class content to remote users that includes a segmented timeline indicating different class portions, tracking remote users' performance throughout the different class segments, and displaying a comparison of the users' performance alongside the segmented class timeline via a time-synced leaderboard that is updated as the class progresses, as demonstrated below.

146.    As recited by Claim 11 of the '406 Patent, iFIT Inc., and iFIT treadmill products with iFIT functionality perform a "method, comprising: causing, on a first display associated with a first treadmill, a first portion of an exercise class to be displayed with a segmented timeline, the segmented timeline including first indicia indicating a first activity to be performed during the first portion of the exercise class and second indicia indicating a second activity to be performed during a second portion of the exercise class."  For example, when an user of an iFIT treadmill product with iFIT functionality requests to view available iFIT classes through iFIT's library, iFIT Inc., and iFIT treadmill products provide an exercise class to be displayed with a segmented timeline, the segmented timeline including first indicia indicating a first activity to be performed during the first portion of the exercise class and second indicia indicating a second activity to be performed

during a second portion of the exercise class.  The iFIT segmented timeline indicates when the user is to, for example, walk, and further indicates when the user is to run.



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality*



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality*



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality*



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality*

147.    As further recited by Claim 11 of the '406 Patent, iFIT Inc., and iFIT treadmill products with iFIT functionality "receiv[e] information indicative of a first performance parameter detected by a sensor associated with the first treadmill, the first performance parameter being associated with a first user running on a belt of the first treadmill during display of the first portion of the exercise class on the first display."  For example, during the display of an iFIT treadmill class with multiple portions, iFIT Inc., and iFIT treadmill products with iFIT functionality receive information indicative of a performance parameter of a user related to the workout portion being performed, such as a user's distance ran, elevation gained, estimated calories burned, speed, or incline parameters, which are detected by sensors associated with the iFIT treadmill product.

148.    As further recited by Claim 11 of the '406 Patent, iFIT Inc., and iFIT treadmill products with iFIT functionality "receiv[e] via a network, information indicative of a second performance parameter associated with a second user, the second performance parameter being detected at a second treadmill during display of the first portion of the exercise class on a second display associated with the second treadmill, the second treadmill being located at location remote from the first treadmill."  For example, during the display of an iFIT treadmill class, iFIT Inc., and iFIT treadmill products with iFIT functionality also receive information indicative of performance parameters of other users who are taking or have taken the treadmill class at a different location using a different treadmill.

149.    As further recited by Claim 11 of the '406 Patent, iFIT Inc., and iFIT treadmill products with iFIT functionality "causing the second performance parameter to be displayed on the first display together with the first performance parameter and the segmented timeline."  For example, as part of iFIT's class UI and Leaderboard feature, iFIT Inc., and iFIT treadmill products with iFIT functionality display the performance parameters of other users who are taking or have

62

taken the iFIT class together with the corresponding parameters of the treadmill product's user and the segmented timeline.



*Above: iFIT's Website's Leaderboard Page, last accessed November 11, 2021*



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality*



*Above: Operation of representative ProForm Pro 9000 treadmill with iFIT functionality*

150.    The above examples of how iFIT products directly infringe Claim 11 of the '406 Patent are non-limiting and based on information currently available to Peloton. In particular, additional aspects of iFIT products may be identified that meet the limitations of Claim 11 of the '406 Patent, additional claims of the '406 Patent may be determined to be infringed, and additional iFIT products may be identified as infringing once additional non-public information is provided through the course of discovery.

151.    On information and belief, iFIT Inc., directly infringes the '406 patent at least by using iFIT treadmill products with iFIT functionality in an infringing manner during iFIT Inc.'s testing, developing, or other operation of such products in the United States.

152.    iFIT Inc., also actively, knowingly, and intentionally induces infringement of one or more claims of the '406 Patent under 35 U.S.C. § 271(b) by actively encouraging others, including at least iFIT's customers, to use iFIT treadmill products with iFIT functionality in an infringing manner.  iFIT Inc., provides significant support and documentation, such as manuals,

guides, webpages, and videos that demonstrates how its products with iFIT functionality can be used.   (*See,   e.g.,*   https://www.ifit.com/equipment;   https://www.nordictrack.com/ifit; https://www.proform.com/ifit).   For example, through its webpages, manuals, and other documentation highlighting iFIT's leaderboard and segmented timeline features, iFIT Inc., encourages and instructs its customers to use its products in a manner that infringes the '406 Patent:



*Above: iFIT's Website's Leaderboard Page, last accessed November 11, 2021*



## TRACK YOUR STATS

Real-time performance stat tracking
that is perfect for keeping you
motivated and engaged.

*Above: iFIT's NordicTrack Website's Commercial X32i Treadmill Page, last accessed*

*November 11, 2021*



**LIVE WORKOUT LEADERBOARD**

Push yourself and compete against the iFIT
community.

*Above: iFIT's NordicTrack Website's Commercial X32i Treadmill Page, last accessed*

*November 11, 2021*



**Interactive Training Sessions**

iFIT trainers move your transformation forward
by interacting with and controlling the Pro
9000's speed, incline, and decline.



**Streaming Global and Studio Class
Workouts**

See the world while you run through cities and
trails, or get pushed in a studio class, all led by
personal trainers in your home.



**Connected Fitness Tracking**

Check your progress as every training session is
automatically recorded and even used to
influence future fitness plans.

*Above: iFIT's ProForm Website's Pro 9000 Treadmill Page, last accessed November 11, 2021*

153.     iFIT Inc., also induces infringement of the '406 Patent by their customers by configuring iFIT products with iFIT functionality to operate in a manner that iFIT knows infringes the '406 Patent.  iFIT Inc., provides its customers with all the requisite hardware, software, and instructions to use iFIT products with iFIT functionality in an infringing manner.  For example, iFIT Inc., provides its treadmill products with iFIT functionality to customers equipped with iFIT software and an iFIT subscription, which encourage and instructs the customers to use the products in a manner that infringes the '406 Patent:



*Above: iFIT's ProForm Website's Pro 9000 Treadmill Page, last accessed November 11, 2021*



*Above: iFIT's ProForm Website's Pro 9000 Treadmill Page, last accessed November 11, 2021*



*Above: iFIT's NordicTrack Website's Commercial X32i Treadmill Page, last accessed*

*November 11, 2021*

154.    iFIT Inc., further actively, knowingly, and intentionally contributorily infringes one or more claims of the '406 Patent under 35 U.S.C. § 271(c) by knowingly making, selling, and/or offering to sell in the United States, and/or importing into the United States iFIT treadmill products with iFIT functionality.  These products are a material part of practicing at least the methods of

Claim 11 of the '406 Patent, have no substantial non-infringing uses, are not a staple article of commerce, and are specially made and adapted for use in an infringing manner.  For example, iFIT treadmill products with iFIT functionality are specifically designed and intended to display treadmill class content to remote users that includes a segmented timeline indicating different class portions, track remote users' performance throughout the different class segments, and display a comparison of the users' performance alongside the segmented class timeline via a time-synced leaderboard that is updated as the class progresses.

155.    Upon information and belief, iFIT Inc., has been aware of Peloton and of its proprietary technologies and intellectual property assets as evidenced by iFIT and Peloton's history of intellectual property disputes and litigations.  Apart from this knowledge, iFIT has had knowledge of the '406 Patent since at least the filing of this lawsuit.

156.    iFIT Inc., actively markets and sells iFIT treadmill products with iFIT functionality to customers across the United States, including in the State of California and the District of Delaware.

157.     iFIT treadmill products with iFIT functionality are also available for purchase on websites managed by iFIT.  iFIT Inc., offers to ship iFIT treadmill products with iFIT functionality to any location in the United States.

158.     iFIT Inc., and iFIT treadmill products with iFIT functionality (which include at least the following: NordicTrack Commercial X32i Incline Trainer Treadmill, NordicTrack Commercial X22i Incline Trainer Treadmill, NordicTrack Commercial 1750 Treadmill, NordicTrack Commercial 2450 Treadmill, NordicTrack Commercial 2950 Treadmill, NordicTrack T 6.5 Si Treadmill, NordicTrack EXP 7i Treadmill, NordicTrack EXP 10i Treadmill, ProForm Pro 9000 Treadmill, ProForm Pro 2000 Treadmill, ProForm Carbon T10 Treadmill,

ProForm City L6 Treadmill, ProForm Carbon T7 Treadmill, FreeMotion t22.9 Reflex Treadmill, and FreeMotion i22.9 Incline Trainer Treadmill) satisfy each and every limitation of one or more claims of the '406 Patent.

####     c.     The '870 Patent

159.    Competitors like iFIT have further sought to market and sell derivative products that infringe on Peloton's valued intellectual property. For example, in February and March of 2021, iFIT Inc., released and began marketing its iFIT "SmartAdjust" and "ActivePulse" features that infringe upon Peloton's '870 Patent.

160.    With the launch of iFIT's SmartAdjust and ActivePulse features, iFIT Inc., and iFIT products with iFIT functionality infringe at least Claim 14 of the '870 Patent by, among other things, receiving a remote user's selected workout program or goals, detecting workout metrics of the remote user, and adjusting or customizing subsequent workouts based on the detected workout metrics, user data, and workout program.

161.    As recited by Claim 14 of the '870 Patent, iFIT Inc., and iFIT products with iFIT functionality perform a "method comprising: receiving and storing in a persistent storage device a fitness objective for an individual."  For example, when a user selects a iFIT workout program and/or sets an iFIT fitness goal, iFIT Inc., and iFIT products with iFIT functionality receive that selection and store the program or goal that is associated with the user's iFIT profile.

162.    As further recited by Claim 14 of the '870 Patent, iFIT Inc., and iFIT products with iFIT functionality "identif[ies] and stor[es] an exercise route for achieving the goal objective using one or more exercise devices, the route including prescribed workout parameters for more than one workout."  For example, after an iFIT user selects a iFIT workout program and/or sets an iFIT fitness goal, iFIT Inc., and iFIT products with iFIT functionality identify a series of workouts associated with that program or goal each of which include a set of workout parameters.



*Above: iFIT Profile Page – Workout Programs, Last Accessed May 25, 2021*





*Above: iFIT Profile Page - Goals, Last Accessed May 25, 2021*

163.    As further recited by Claim 14 of the '870 Patent, iFIT Inc., and iFIT products with iFIT functionality "receiv[e] exercise metrics from a first workout and a second workout subsequent to the first workout."  For example, as part of iFIT's SmartAdjust and/or ActivePulse features, iFIT Inc., and iFIT products with iFIT functionality receive workout metrics from the iFIT user during the user's workouts, such as the speed, incline, estimated calories burned, elevation, distance, and heart rate.

164.    As further recited by Claim 14 of the '870 Patent, iFIT Inc., and iFIT products with iFIT functionality "form[] a comparison of the exercise metrics with the exercise route to adjust the recommended workout parameters for the second workout of the route based on the comparison."  For example, as part of iFIT's SmartAdjust and/or ActivePulse features, iFIT Inc., and iFIT products with iFIT functionality adjusts or customizes the parameters of the iFIT user's current or future workouts based on comparisons of the user's received workout metrics and the user's workout history, current workout parameters, and workout programs or goals.



**Interactive Training Sessions**

iFIT trainers move your transformation forward by interacting with and controlling the Pro 9000's speed, incline, and decline.



**Streaming Global and Studio Class Workouts**

See the world while you run through cities and trails, or get pushed in a studio class, all led by personal trainers in your home.



**Connected Fitness Tracking**

Check your progress as every training session is automatically recorded and even used to influence future fitness plans.

*Above: iFIT's ProForm Website's Pro 9000 Treadmill Page, last accessed November 11, 2021*



This feature auto-updates your workout, based on your history and how you adjust your speed, incline, or decline during your workout. Over time, this technology establishes a baseline, then alters your workouts for you as you progress. Learn more about SmartAdjust, and watch our instructional video.

*Above: iFIT's Introducing ActivePulse and SmartAdjust Page, Last Accessed November 11, 2021*



If you make adjustments to speed or incline with SmartAdjust and ActivePulse off, you will be in control of your speed and incline. You can click the "Follow Trainer" button at any time to return to the trainer's prescribed workout.



Over time, SmartAdjust learns from these actions and caters the workout to your fitness level, balancing it with your trainer's instructions.

*Above: iFIT's Introducing SmartAdjust Page, Last Accessed November 11, 2021*



Once the workout begins, you'll receive a trainer notification during your warmup, informing you that we've taken your past workouts into account to craft a personalized session for you.



While SmartAdjust is on, feel free to adjust the resistance, incline, or decline during your workout, so it feels comfortable for your fitness level.



Over time, SmartAdjust learns from these actions and caters the workout to your fitness level, balancing it with your trainer's instructions.

*Above: iFIT's Introducing SmartAdjust for Your Bike Page, Last Accessed November 11, 2021*

**What is ActivePulse?**



ActivePulse is iFit's first heart rate training feature, designed for users who want to get the most out of their workouts. With ActivePulse turned on and a Bluetooth®-enabled heart rate monitor connected to your machine, the intensity of your workout will be automatically adjusted, based on your target heart rate zone. You will automatically be sped up or slowed down in order to maintain the ideal heart rate zone for your workout. This includes recovery, speed, or strength runs!

ActivePulse is not currently available for manual workouts or Live Workouts.

An initial number for your max heart rate will automatically be calculated for you, according to your profile information. In your settings, you can adjust your max heart rate and resting heart rate, or you can take a max heart rate test.

Ready to try ActivePulse? Join iFit Trainer Gideon Akande for an introduction to this new feature in the Intro to ActivePulse Workout.

*Above: iFIT's Introducing ActivePulse Page, Last Accessed November 11, 2021*

165.   Finally, as further recited by Claim 14 of the '870 Patent, iFIT Inc., and iFIT products with iFIT functionality "display[] the adjusted route to the individual." For example, as part of iFIT's SmartAdjust and/or ActivePulse features, iFIT Inc., and iFIT products with iFIT functionality display the adjusted or customized parameters of the ifit user's workouts.



*Above: iFIT's Introducing SmartAdjust Page, Last Accessed November 11, 2021*



Once the workout begins, you'll receive a trainer notification during your warmup, informing you that we've taken your past workouts into account to craft a personalized session for you.

*Above: iFIT's Introducing SmartAdjust for Your Bike Page, Last Accessed November 11, 2021*



*Above: iFIT's Introducing ActivePulse Page, Last Accessed November 11, 2021*

166.    The above examples of how iFIT products directly infringe Claim 14 of the '870 Patent are non-limiting and based on information currently available to Peloton. In particular, additional aspects of iFIT products may be identified that meet the limitations of Claim 14 of the '870 Patent, additional claims of the '870 Patent may be determined to be infringed, and additional iFIT products may be identified as infringing once additional non-public information is provided through the course of discovery.

167.    On information and belief, iFIT Inc., directly infringes the '870 patent at least by using iFIT products with iFIT functionality in an infringing manner during iFIT Inc.'s testing, developing, or other operation of such products in the United States.

168.    iFIT Inc., also actively, knowingly, and intentionally induces infringement of one or more claims of the '870 Patent under 35 U.S.C. § 271(b) by actively encouraging others, including at least iFIT's customers, to use iFIT products with iFIT functionality in an infringing manner.  iFIT Inc., provides significant support and documentation, such as manuals, guides, webpages, and videos, that demonstrates how its products  with iFIT functionality can be used. (*See e.g.*, https://www.ifit.com/blog/introducing-activepulse-and-smartadjust/).   For example, through its webpages, manuals, and other documentation promoting its SmartAdjust and ActivePulse features, iFIT Inc., encourages and instructs its customers to use its products in a manner that infringes the '870 Patent:



*Above: iFIT's Introducing SmartAdjust Page, Last Accessed November 11, 2021*

At iFIT, we're focused on giving you a truly interactive workout experience. That's why iFIT-enabled equipment automatically adjusts your resistance, incline, and decline during your workouts. However, that experience isn't just about climbing hills or challenging yourself. We've extended it to a new feature called SmartAdjust: our latest technology that tailors your workout to your individual fitness level!



*Above: iFIT's Introducing SmartAdjust for Your Bike Page, Last Accessed November 11, 2021*



At iFit, we're focused on giving you a truly interactive workout experience. That's why iFit-enabled equipment automatically adjusts your incline, decline, and resistance during workouts. That experience isn't just about climbing hills or challenging yourself, however. We've extended it to a new, groundbreaking feature called ActivePulse: our latest tech that uses your heart rate to personalize your workout!

We've also introduced another new interactive feature for iFit-enabled treadmills called SmartAdjust™ that automatically scales your workout as you make adjustments to either the speed or incline, so you can follow along with the trainer at your own pace.

*Above: iFIT's Introducing ActivePulse Page, Last Accessed November 11, 2021*

169.    iFIT Inc., also induces infringement of the '870 Patent by their customers by configuring iFIT products with iFIT functionality to operate in a manner that iFIT knows infringes the '870 Patent.  iFIT Inc., provides its customers with all the requisite hardware, software, and instructions to use iFIT products with iFIT functionality in an infringing manner.  For example,

iFIT Inc., provides its products with iFIT functionality to customers equipped with iFIT software and an iFIT subscription, which encourage and instructs the customers to use the products in a manner that infringes the '870 Patent:



*Above: iFIT's Introducing SmartAdjust Page, Last Accessed November 11, 2021*

# Equipment required for SmartAdjust

Use SmartAdjust on your iFIT-enabled bike or your iFit-enabled bike that connects to the iFIT app on a tablet via Bluetooth®. (This feature is not currently available on phones.)



*Above: iFIT's Introducing SmartAdjust for Your Bike Page, Last Accessed November 11, 2021*



*Above: iFIT's Introducing ActivePulse Page, Last Accessed November 11, 2021*

170.     iFIT Inc., further actively, knowingly, and intentionally contributorily infringes one

or more claims of the '870 Patent under 35 U.S.C. § 271(c) by knowingly making, selling, and/or

offering to sell in the United States, and/or importing into the United States iFIT products with

iFIT functionality.  These products are a material part of practicing at least the methods of Claim

14 of the '870 Patent, have no substantial non-infringing uses, are not a staple article of commerce,

and are specially made and adapted for use in an infringing manner.  For example, iFIT products

with iFIT functionality are specifically designed and intended to receive a user's selected workout

program and goals, detect workout metrics of the remote user, and adjust subsequent workouts of

the user based on the detected metrics, and the user's profile data and workout program.

171.    Upon information and belief, iFIT Inc., has been aware of Peloton and of its proprietary technologies and intellectual property assets as evidenced by iFIT and Peloton's history of intellectual property disputes and litigations. Apart from this knowledge, iFIT has had knowledge of the '870 Patent since at least the filing of this lawsuit.

172.    iFIT Inc., actively markets and sells iFIT products with iFIT functionality to customers across the United States, including in the State of California and the District of Delaware.

173.    iFIT products with iFIT functionality are also available for purchase on websites managed by iFIT.  iFIT Inc., offers to ship iFIT products with iFIT functionality to any location in the United States.

174.    iFIT Inc., and iFIT products with iFIT functionality (which include at least the following: NordicTrack Commercial X32i Incline Trainer Treadmill, NordicTrack Commercial X22i Incline Trainer Treadmill, NordicTrack Commercial 1750 Treadmill, NordicTrack Commercial 2450 Treadmill, NordicTrack Commercial 2950 Treadmill, NordicTrack T 6.5 Si Treadmill, NordicTrack EXP 7i Treadmill, NordicTrack EXP 10i Treadmill, ProForm Pro 9000 Treadmill, ProForm Pro 2000 Treadmill, ProForm Carbon T10 Treadmill, ProForm City L6 Treadmill, ProForm Carbon T7 Treadmill, FreeMotion t22.9 Reflex Treadmill, FreeMotion i22.9 Incline Trainer Treadmill NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack Commercial VR25 Recumbent Bike, Nordictrack Commercial R35 Recumbent Bike, NordicTrack Commercial VU 19 Upright Bike, and NordicTrack Commercial VU 29 Upright Bike,) satisfy each and every limitation of one or more claims of the '870 Patent.

####    d.    The '755 Patent

175.    In addition to copying and appropriating Peloton's intellectual property with iFIT's software features, iFIT Inc., also infringes on Peloton's patented exercise device hardware technology.   For example, iFIT Inc., and certain iFIT treadmill products that include an air dam component or its equivalence infringe the '755 Patent, including the NordicTrack Commercial X32i and FreeMotion Reflex 10.9 Treadmill models currently available for purchase on websites managed by iFIT Inc.



*Above: iFIT's NordicTrack Commercial X32i Webpage, Last Accessed May 25, 2021*



*Above: iFIT's FreeMotion t10.9 Treadmill Webpage, Last Accessed May 25, 2021*

176.    iFIT Inc., and certain iFIT treadmill products infringe at least Claim 1 of the '755 Patent by, among other things, including an air dam component that extends generally a majority length of the roller and substantially isolating the motor compartment from the endless belt, thereby substantially reduces airflow and cross-contamination of debris between the endless belt and the motor compartment.

177.    As recited by Claim 1 of the '755 Patent, certain iFIT treadmill products that include an air dam component or its equivalence have  "a frame, a motor compartment, a roller assembly located adjacent the motor compartment."

178.    As further recited by Claim 1 of the '755 Patent, certain iFIT treadmill products that include an air dam component or its equivalence have "an endless belt entrained about the roller assembly" and "an air dam located between the motor compartment and the roller assembly

and connected to the frame; the air dam extending generally a majority length of the roller and substantially isolating the motor compartment from the endless belt."

179.    As recited by Claim 1 of the '755 Patent, certain iFIT treadmill products include an air dam component or its equivalence which "substantially reduces airflow and cross-contamination of debris between the endless belt and the motor compartment."



*Above: "FreeMotion 11.3 Reflex Treadmill Belt & Deck Replacement" YouTube Video, last accessed May 25, 2021*



*Above: "FreeMotion 11.3 Reflex Treadmill Belt & Deck Replacement" YouTube Video, last*

*accessed May 25, 2021*



*Above: iFIT's "Treadmill Preventive Maintenance" YouTube Video showing a FreeMotion*

*Reflex 11.3 Treadmill, last accessed May 25, 2021*



*Above: "Replacing a NordicTrack C2300 Treadmill Front Roller" YouTube Video showing a*

*NordicTrack C2300, last accessed May 25, 2021*



*Above:* "How to fix treadmill, PROFORM repair" *YouTube Video showing a ProForm 750*

*Treadmill, last accessed May 25, 2021*

180.    iFIT Inc., actively markets and sells iFIT treadmill products that include an air dam component or its equivalence to customers across the United States, including in the State of California and the District of Delaware.

181.    iFIT treadmill products that include an air dam component are and have been available for purchase on websites managed by iFIT Inc.  iFIT Inc., offers to ship iFIT treadmill products that include an air dam component to any location in the United States.

182.    iFIT Inc., and iFIT treadmill products that include an air dam component or its equivalence (which include at least the following: NordicTrack Commercial X32i Incline Trainer, NordicTrack Commercial X22i Incline Trainer, NordicTrack C2300 Treadmills, NordicTrack EXP 2000 Treadmills, FreeMotion Reflex 10.9 Reflex Treadmills, FreeMotion Reflex 11.3 Treadmills, FreeMotion Reflex 11.8 Treadmills, ProForm 700 LT Treadmills, ProForm 750 Treadmills, and ProForm Performance 400 Treadmills) satisfy each and every limitation of one or more claims of the '755 Patent.

## COUNT I
### (Infringement of the '886 Patent)

183.    Peloton incorporates all other allegations in this Complaint and Exhibit 1 attached hereto.

184.    Peloton is the owner of all rights, title, and interest in the '886 Patent. The '886 Patent issued on November 9, 2021.

185.    The '886 Patent is valid and enforceable.

186.    In violation of 35 U.S.C. § 271(a), iFIT Inc. makes, uses, offers to sell, and sells iFIT products with iFIT functionality (including at least ProForm Pro 9000 Treadmill, ProForm

Pro 2000 Treadmill, ProForm Carbon T10 Treadmill, ProForm Carbon T7 Treadmill, ProForm City L6 Treadmill, ProForm Studio Bike Pro 22, ProForm Studio Bike Pro, ProForm Carbon CX Studio Bike, ProForm 440 ES Recumbent Bike, ProForm 8.0 EX Upright Bike, ProForm Studio Bike Limited, ProForm 750R Rower, ProForm Pro R10 Rower, ProForm 759R Rower, ProForm Carbon HIIT H14 Elliptical, ProForm Carbon HIIT H7 Elliptical, ProForm Carbon E7 Elliptical, ProForm Carbon EL Elliptical, ProForm Hybrid Trainer XT Elliptical, NordicTrack Commercial X321 Incline Trainer, NordicTrack Commercial X22i Incline Trainer, NordicTrack Commercial 1750 Treadmill, NordicTrack Commercial 2450 Treadmill, NordicTrack Commercial 2950 Treadmill, NordicTrack T 6.5 Si Treadmill, NordicTrack EXP 7i Treadmill, NordicTrack EXP 10i Treadmill, NordicTrack T 9.5 S Treadmill, NordicTrack 8.5 S Treadmill, NordicTrack Commercial S22i Studio Cycle, NordicTrack Commercial S15i Studio Cycle, NordicTrack Commercial VR25 Recumbent Bike, Nordictrack Commercial R35 Recumbent Bike, NordicTrack Commercial VU 19 Upright Bike, NordicTrack Commercial VU 29 Upright Bike, NordicTrack FS14i Elliptical, NordicTrack FS10i Elliptical, NordicTrack Commercial 9.9 Elliptical, NordicTrack Commercial 14.9 Elliptical, NordicTrack Commercial SpaceSaver SE9i Elliptical, NordicTrack Commercial SpaceSaver SE7i Elliptical, NordicTrack Fusion CST Pro, NordicTrack Fusion CST Pro with Rower, NordicTrack RW900 Rower, NordicTrack RW700 Rower, NordicTrack RW500 Rower, FreeMotion t22.9 Reflex Treadmill, FreeMotion i22.9 Incline Trainer, Freemotion T10.9b Reflex Treadmill, FreeMotion e22.9 Elliptical, Freemotion E10.9b Elliptical, FreeMotion CoachBike, FreeMotion r22.9 Recumbent Bike, FreeMotion u22.9 Upright Bike, and Freemotion R10.96b Recumbent Bike) and thereby directly infringes the '886 Patent. iFIT Inc. and iFIT products with iFIT functionality satisfy each and every limitation of one or more claims of the '886 Patent. iFIT Inc. thereby directly infringes one or more claims of the '886 Patent.

187.    In violation of 35 U.S.C. § 271(b), iFIT Inc. advertises to, sells to, encourages, and instructs third parties, including iFIT Inc. customers, to use iFIT products with iFIT functionality. iFIT Inc. thereby induces infringement of one or more claims of the '886 Patent, by having the specific intent to induce its customers to infringe the '886 Patent, despite knowledge that its customers' acts infringe the '886 Patent.

188.    In violation of 35 U.S.C. § 271(c), iFIT Inc. offers to sell, and sells, material components of the '886 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including iFIT Inc.'s customers. iFIT Inc. has thereby contributorily infringed, and continues to contributorily infringe, one or more of the claims of the '886 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the '886 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

189.    Peloton has suffered, and continues to suffer, damages and irreparable harm because of iFIT Inc.'s ongoing infringement.

190.    Unless iFIT Inc.'s infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

191.    Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

### COUNT II

### (Infringement of the '406 Patent)

192.    Peloton incorporates by reference the foregoing paragraphs in these Counterclaims.

193.    Peloton is the owner of all rights, title, and interest in the '406 Patent.  The '406 Patent issued on December 15, 2020.

194.    The '406 Patent is valid and enforceable.

195.    In violation of 35 U.S.C. § 271(a), iFIT Inc., makes, uses, offers to sell, and sells iFIT treadmill products with iFIT functionality and thereby directly infringes the '406 Patent.  iFIT Inc., and iFIT treadmill products with iFIT functionality satisfy each and every limitation of one or more claims of the '406 Patent.  iFIT Inc., thereby directly infringes one or more claims of the '406 Patent.

196.    In violation of 35 U.S.C. § 271(b), iFIT Inc., advertises to, sells to, encourages, and instructs third parties, including iFIT customers, to use iFIT treadmill products with iFIT functionality.  iFIT Inc., thereby induces infringement of one or more claims of the '406 Patent, by having the specific intent to induce its customers to infringe the '406 Patent, despite knowledge that its customers' acts infringe the '406 Patent.

197.    In violation of 35 U.S.C. § 271(c), iFIT Inc., offers to sell, and sells, material components of the '406 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including iFIT's customers.  iFIT Inc., has thereby contributorily infringed, and continues to contributorily infringe, one or more of the claims of the '406 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the '406 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

198.    Peloton has suffered, and continues to suffer, damages and irreparable harm because of iFIT's ongoing infringement.

199.    Unless iFIT's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

200.    Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## COUNT III

### (Infringement of the '870 Patent)

201.    Peloton incorporates by reference the foregoing paragraphs in these Counterclaims.

202.    Peloton is the owner of all rights, title, and interest in the '870 Patent.  The '870 Patent issued on September 9, 2014.

203.    The '870 Patent is valid and enforceable.

204.    In violation of 35 U.S.C. § 271(a), iFIT Inc., makes, uses, offers to sell, and sells iFIT products with iFIT functionality and thereby directly infringes the '870 Patent.  iFIT Inc., and iFIT products with iFIT functionality satisfy each and every limitation of one or more claims of the '870 Patent.  iFIT thereby directly infringes one or more claims of the '870 Patent.

205.    In violation of 35 U.S.C. § 271(b), iFIT Inc., advertises to, sells to, encourages, and instructs third parties, including iFIT customers, to use iFIT products with iFIT functionality.  iFIT Inc., thereby induces infringement of one or more claims of the '870 Patent, by having the specific intent to induce its customers to infringe the '870 Patent, despite knowledge that its customers' acts infringe the '870 Patent.

206.    In violation of 35 U.S.C. § 271(c), iFIT Inc., offers to sell, and sells, material components of the '870 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including iFIT's customers.  iFIT Inc., has thereby contributorily infringed, and continues to contributorily infringe, one or more of the claims of the '870 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the '870 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

207.    Peloton has suffered, and continues to suffer, damages and irreparable harm because of iFIT's ongoing infringement.

208.    Unless iFIT's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

209.    Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

**COUNT IV**

**(Infringement of the '755 Patent)**

210.    Peloton incorporates by reference the foregoing paragraphs in these Counterclaims.

211.    Peloton is the owner of all rights, title, and interest in the '755 Patent.  The '755 Patent issued on May 10, 2011.

212.    The '755 Patent is valid and enforceable.

213.    In violation of 35 U.S.C. § 271(a), iFIT Inc., makes, uses, offers to sell, and sells the iFIT treadmill products that include an air dam component or its equivalence and thereby directly infringes the '755 Patent.  iFIT Inc., and the iFIT treadmill products that include an air dam component or its equivalence satisfy each and every limitation of one or more claims of the '755 Patent.  iFIT Inc., thereby directly infringes one or more claims of the '755 Patent.

214.    In violation of 35 U.S.C. § 271(b), iFIT Inc., advertises to, sells to, encourages, and instructs third parties, including iFIT customers, to use iFIT treadmill products with iFIT functionality.  iFIT Inc., thereby induces infringement of one or more claims of the '755 Patent, by having the specific intent to induce its customers to infringe the '755 Patent, despite knowledge that its customers' acts infringe the '755 Patent.

215.    In violation of 35 U.S.C. § 271(c), iFIT Inc., offers to sell, and sells, material components of the '755 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including iFIT's customers.  iFIT Inc., has thereby contributorily infringed, and continues to contributorily infringe, one or more of the claims of the

93

'755 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the '755 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

216.    Peloton have suffered, and continues to suffer, damages and irreparable harm because of iFIT's ongoing infringement.

217.    Unless iFIT's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

218.    Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Peloton respectfully asks that the Court enter judgment againstDefendant iFIT Inc. as follows:

219.    That Defendant iFIT Inc. has infringed (either literally or under the doctrine of equivalents) directly, jointly, and/or indirectly by way of practicing, inducing or contributing to the infringement of one or more claims of the '886, '406, '775, and '870 Patents;

220.    For temporary, preliminary, and permanent injunctive relief enjoining Defendant iFIT Inc. and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with it, from infringing, inducing the infringement, or contributing to the infringement of the '886, '406, '775, and '870  Patents;

221.    For an award to Peloton for its damages, costs, expenses, and prejudgment and post-judgment interest for iFIT Inc.'s infringement of the '886, '406, '775, and '870 Patents;

222.    For a declaration finding this case exceptional under 35 U.S.C. § 285;

223.    Reasonable attorneys' fees and costs against iFIT Inc.; and

224.    For any and all other relief to which Peloton may show itself to be entitled.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.


Morris, Nichols, Arsht & Tunnell LLP

*/s/ Michael J. Flynn*

_____

OF COUNSEL:

Steven N. Feldman
Stephen D. O'Donohue
Joseph C. Akalski
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Lawrence J. Gotts
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200

Marc N. Zubick
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 26048
(312) 876-7700


November 12, 2021

Michael J. Flynn (#5333)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mflynn@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Peloton Interactive, Inc.*